1            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF CALIFORNIA
2                    --oOo--

3   UNITED STATES OF AMERICA,    ) Docket No. 17-MJ-00104-SAB-1
                                 )
4                                ) Fresno, California
                   Plaintiff,    ) June 23, 2017
5                                ) 2:06 p.m.
          v.                     )
6                                )
    ASHLEY MADDOX,               ) Re: Detention hearing
7                                )
                   Defendant.    )
8
                TRANSCRIPT OF PROCEEDINGS
9        BEFORE THE HONORABLE BARBARA A. McAULIFFE
            UNITED STATES MAGISTRATE JUDGE
10
    APPEARANCES:
11
    For the Plaintiff:      HON. PHILLIP A. TALBERT
12                          United States Attorney by
                            MR. DAVID GAPPA
13                          Assistant U.S. Attorney
                            2500 Tulare Street, Suite 4401
14                          Fresno, CA 93721

15  For the Defendant:      OFFICE OF THE FEDERAL DEFENDER by
                            MS. MEGAN TAYLOR HOPKINS
16                          2300 Tulare Street, Suite 330
                            Fresno, CA 93721
17
    ALSO PRESENT:           MONTGOMERY L. OLSON
18                          Deputy Chief Pretrial Services Officer

19  Court Recorder:         OTILIA ROSALES
                            U.S. District Court
20                          2500 Tulare Street, Suite 1501
                            Fresno, CA 93721
21                          (559)499-5928

22  Transcribed by:         JENNIFER COULTHARD, RMR, CRR
                            Official Court Reporter
23                          501 I Street, Suite 14-243
                            Sacramento, CA 95814
24                          (312)617-9858
                            Jenrmrcrr2@gmail.com
25  Proceedings recorded by electronic sound recording; transcript
    produced by official court reporter.

JENNIFER COULTHARD - OFFICIAL COURT REPORTER - USDC - (312)617-9858

1          FRESNO, CALIFORNIA, FRIDAY, JUNE 23, 2017

2                          --oOo--

3      (The following proceedings were had in open court.)

4          THE COURT:  We have the *United States v. Ashley*

5  *Maddox*, Case No. 17-104.

6          May I have your appearances for the record, please.

7          MR. GAPPA:  Good afternoon, your Honor; David Gappa

8  for the United States.

9          MS. HOPKINS:  Good afternoon, your Honor; Megan

10  Hopkins here with Ashley Maddox, who is present in custody.

11          THE COURT:  Okay.  All right.  We're back here for a

12  detention hearing.  I have received now both the pretrial

13  services report, the original report, and the supplemental

14  report of June 23, as well as some communication which I

15  believe was also CC'd to defense counsel with some attachments

16  pertaining to communications by the defendant as well.  So let

17  me hear from the government first here.

18          MR. GAPPA:  Your Honor, we are strongly opposed to the

19  defendant's release.  We don't think these proposed conditions

20  would adequately ensure the safety of the community.

21          As I'm sure the Court knows, there is a rebuttable

22  presumption that the defendant is both a flight risk and a

23  danger to the person of at least one person and/or the

24  community.  We don't believe she's rebutted that presumption.

25          The Ninth Circuit has given guidance on how the Court

1   should construe the statutory factors.  Notably, in a decision

2   that Judge Reinhardt wrote, there's reference to the four

3   factors if the defendant meets its burden of production, which

4   we don't think has been done in this case and does something to

5   rebut the presumption, then the Court has to consider the

6   nature and circumstances of the offense charged, the weight of

7   the evidence against the person, history and characteristics of

8   the person, including their character, physical and mental

9   condition, family and community ties, employment, financial

10  resources, past criminal conduct and history related to drug or

11  alcohol abuse and then the danger to any person or the

12  community that would be imposed by the defendant's release.

13        And Judge Reinhardt noted that the presumption doesn't

14  disappear if the defendant comes forward with evidence.  So our

15  position is she hasn't come forward with anything yet, that

16  simply placing conditions on her, which in our view are not

17  adequate because the statute requires, at a minimum, electronic

18  monitoring and that's not available in this district, and so

19  even though we don't think it would be appropriate to release

20  her, these conditions, as fashioned, do not even comply with

21  the statute.

22        THE COURT:  I just want to get a clarification; not

23  that I'm disagreeing with you, but when you're saying

24  "electronic monitoring," the monitoring that we have, you're

25  saying it requires some kind of GPS as opposed to radio

JENNIFER COULTHARD - OFFICIAL COURT REPORTER - USDC - (312)617-9858

1    frequency, which is --

2          MR. GAPPA:  Correct.  Because under -- and I'm not

3    saying that under these proposed conditions that she would be

4    allowed out 23 hours a day, but in theory, if she's allowed out

5    for counseling, to go to court, to visit the attorney, for

6    medical appointments, there's no way to know what she's doing

7    there in that time.  So she could be doing those things and/or

8    other things, but we simply don't know.  So that's the concern.

9    And under these offenses, Congress amended the pretrial release

10   conditions to require electronic monitoring.  That does not

11   mean that she's simply confined to home for some of the time

12   and that when she's not at home, she's not monitored.  We don't

13   think that's compliance with the statute.

14         But then looking at the factors, the defendant does

15   not have employment now.  The agent who has worked on the case

16   was informed that her former employer has terminated her

17   employment.  So she has no work lined up.  And it's, in the

18   government's view, somewhat significant that part of the

19   offense was committed while at work.  In the chats that we've

20   submitted to the Court and counsel yesterday, there's reference

21   to "I wish I weren't at work so that I could see some of this

22   contraband," indicating that she was committing the offense

23   while at work, which is just one more indication of her

24   unreliability, her willingness to breach the trust.  But more

25   significant than that is the trust that was placed in her as a

1   parent and as a mother.  That's an inviable bond that should

2   have been in place to keep her from doing what she did.  She

3   violated that.  That would seem to be, for most people,

4   something much more significant than what -- any condition the

5   Court could put in place.  And the fact that she's willing to

6   do that with her own child is -- is significant and should

7   undermine the Court's confidence that she would abide by the

8   conditions that the Court might fashion.

9        She doesn't have financial resources.  That is a

10   consideration.  Her car was repossessed.  She apparently has no

11   savings.  As noted, she has no employment.  She's done nothing

12   since the offense to mitigate the risk to the public.  She

13   apparently felt bad about it.  At some point she deleted some

14   of the material but then went back and reestablished contact

15   with the other offender and asked for more material, shared

16   material with that person.

17        There's no indication that she's gone into counseling.

18   The proposal is that she attend counseling.  There's obviously

19   a need for it.  It hasn't been done.

20        If there were some intervening track record of good

21   performance counseling that would, I think, be a factor in her

22   favor.  It's absent.  There is no third-party custodian that

23   could adequately supervise her.  The boyfriend works, her

24   sister works.  We were told by the agent that when they

25   confronted him, let him know what the nature of the case was,

1    his first reaction was to try to get a restraining order

2    against her so that she wouldn't have access to his children.

3    So that would give some indication of how he viewed this.  It

4    seems that that relationship was established after the offense

5    conduct here so that it's notable because, for one, it's a

6    relatively short duration, apparently 18 months or less.  But

7    the fact that either she's made him aware of this and it

8    doesn't bother him or she managed to keep it from him should

9    give some concern to the Court for this person to be a

10   third-party custodian because she's obviously demonstrated an

11   ability to conceal things from him, again, undermining whatever

12   reliability there would be of him as a monitor.

13          I think it's significant, too, that the offense is

14   committed relatively easily.  We all know how easy it is to

15   obtain a phone, which is what was used in part to commit this

16   offense.  It's very easy to establish an Internet connection,

17   even if there's none in the home.  That's not needed.  Very

18   easy to establish a connection simply through the phone and a

19   provider.  There's nobody there to monitor 24 hours a day, so

20   we just can't imagine any set of conditions that could be

21   fashioned to reasonably ensure the safety of any minors,

22   particularly those that she's demonstrated a sexual interest

23   in.

24          She not only abused her own daughter and recorded that

25   and sent images of that to the person in Florida, she

1    encouraged that person to abuse a child there, so it's

2    something that's organic within her.  It hasn't been addressed.

3    It's a very compelling drive that she has.  There's no

4    indication that that's going to change.  So there are

5    significant risks if the Court were inclined to let her out.

6    We don't think those have been mitigated and we don't think

7    she's rebutted the presumption that she's a danger.

8         THE COURT:  All right.  Thank you, Mr. Gappa.

9         I tend to agree.  Even with these conditions, I

10   consider this defendant a very dangerous person and by

11   releasing her even on the conditions that have been proposed

12   here causes me significant pause and -- but I'll allow you to

13   argue what you think in order to attempt to change my mind, but

14   that's where you've got to convince me that the conditions,

15   even these conditions that have been proposed by pretrial

16   services to me, do not provide sufficient assurance that the

17   crimes here or similar crimes could not be -- take place.  As

18   Mr. Gappa put it, I would have put it a little differently, but

19   he put it as a breach of trust, and I'm significantly

20   concerned.

21        MS. HOPKINS:  Well, you know, to begin with, I think

22   we can certainly rebut the presumption, and I think we should

23   start there just procedurally.

24        To begin with, Ms. Maddox was working up until the

25   time of the allegations coming to bear, which was in June of

1   this year.  She has lived her whole life and has all of her

2   ties here.  Her family is in Fresno, her partner, who she's

3   been with now for more than a year, and her home is in Madera,

4   all of which are in the Eastern District of California.  She --

5   the government has put forth allegations and has -- and as the

6   Court indicated, the Court has received the request to file

7   under seal a transcript of a chat period that lasted

8   approximately five weeks but ended in December of 2015.  And

9   there's no evidence or indication that the conduct was ongoing

10   after December of 2015.  And so for the past 18 months, there's

11   no indication that Ms. Maddox engaged in any illegal conduct

12   whatsoever, and specifically not conduct related to the

13   allegations in this case.

14        Ms. Maddox has relatively no criminal history apart

15   from one traffic matter that is explained in the pretrial

16   services report, and so I think we can sufficiently rebut the

17   presumption.  And then it becomes a question of whether or not

18   there are conditions which can reasonably assure the safety of

19   the community.  And I think that's really the issue here.  I

20   don't think that flight is an issue whatsoever.  And so what

21   we're talking about here is whether or not there is a future

22   danger posed by Ms. Maddox's release and whether or not that

23   danger can be mitigated by these conditions.

24        Ms. Maddox will be -- if the Court adopts the proposal

25   in the pretrial services report, which is certainly what we

1   would propose, Ms. Maddox would be residing in a home with no

2   Internet access where there are no children.  Her own children,

3   one of whom is the alleged victim in this case, would not be in

4   the home and would not have any conduct -- I'm sorry, contact

5   with Ms. Maddox.  There is a restraining order, and she will

6   not have any contact with them.  There is no indication that we

7   have received, and I think that -- and no indication before the

8   Court that there are any other alleged victims in this case,

9   which she could conceivably have contact with.

10        We have proposed two alternative third-party

11  custodians, and I think that the pretrial services report

12  proposes that they be made joint third-party custodians, but

13  the Court is, of course, at liberty to appoint one or the other

14  or both jointly.  We would propose both jointly.  I think it

15  adds an added level of security.  It also would allow the two

16  of them to collaborate to ensure that if the Court is concerned

17  about her traveling for an appointment for mental healthcare or

18  counseling, for her traveling to court to make a court

19  appearance or to meet with her counsel, that someone is

20  available to travel alongside her.  That's not a condition

21  that's proposed by pretrial services, but certainly one that we

22  wouldn't oppose, that she have a third-party custodian travel

23  with her at the time.

24        If the government is concerned that based on what is

25  available in terms of location monitoring in this district,

1  that it's insufficient, that certainly can be addressed by

2  adjusting the conditions or the way the conditions are

3  fashioned.

4        The government raises a point that the location

5  monitoring available in our district doesn't meet the standards

6  set forth in the case law, but it seems to me that the

7  government has been arguing that per se anyone accused of these

8  crimes is not eligible for release, and that simply does not

9  comport with the Bail Reform Act.

10        If there are conditions that would reasonably assure

11  the safety of the community, then Ms. Maddox is entitled to be

12  released while her case is pending.

13        At this time, these are allegations alone, and we're

14  not having a trial as to whether or not she committed the

15  offenses here today, and so I would urge the Court to focus on

16  the future danger posed to the community and that that can be

17  mitigated.

18        Ms. Maddox, like I said, has not engaged in any

19  illegal conduct even as alleged by the government since

20  December of 2015.  She is in a relationship with a new

21  individual, a positive relationship, where she's only

22  demonstrated very positive conduct.

23        The government raised the point that had there been

24  some intervening period of positive conduct that might change

25  the perspective, and I would put forth that there has been.

JENNIFER COULTHARD - OFFICIAL COURT REPORTER - USDC - (312)617-9858

1   Since December of 2015, Ms. Maddox has been a law-abiding

2   individual who was working up until the point where these

3   charges were alleged or were put forth, and she lost her job

4   solely on the basis of these charges.

5           She had a very full and active life and was an active

6   member in her community and continues to be an active member of

7   her community.  She's willing to abide by any conditions the

8   Court wants to put forward to reasonably assure the safety of

9   the community.

10          Her sister, who is one of our proposed third-party

11  custodians, is very close with her, is in regular contact with

12  her, and is willing to serve as third-party custodian, is

13  present here in court today as well as her mother and her

14  partner, Cameron, who is our second proposed third-party

15  custodian, both of whom are willing to come and speak with the

16  Court.  The Court can inquire of them whether or not they fully

17  understand the weight of that responsibility.  I assure the

18  Court that they do, but they are both ready and willing to

19  speak with the Court about that, if that's necessary.

20          With regard to the weight of the allegations, the

21  weight of the evidence in this case, the government so far has

22  only provided five weeks of conduct, which is certainly very

23  concerning.

24          THE COURT:  Um-hmm.

25          MS. HOPKINS:  But it's a very short period of time,

1    and I think demonstrates that this wasn't --

2           THE COURT:  So if it was only one time, then that

3    would have been sufficient and she can get out; that's not

4    dangerous?

5           MS. HOPKINS:  No, your Honor.  That's not what I'm

6    saying.  But I am saying it's a different situation than an

7    individual who shows a lengthy period of conduct -- pattern of

8    conduct.

9           I think that this Court and perhaps not this Court

10   specifically but certainly the Eastern District of California

11   has seen individuals that have faced these allegations who have

12   had much longer patterns of conduct and were still eligible for

13   release under conditions.  And I think that a per se rule that

14   someone who bases these allegations -- and these allegations

15   being the sole factor that indicates that they are, in fact, a

16   danger to the community -- being sufficient to detain them is a

17   very dangerous standard to set and one that is contrary to the

18   Bail Reform Act.

19          I think Ms. Maddox has a tremendous amount of family

20   support, which is unusual in a case like this.  I'm sure the

21   government is well aware that in most cases there isn't this

22   amount of family support.  And the government draws into

23   question the judgment of that support.  And I would draw the

24   contrary; that these are individuals that want to see her

25   succeed through this situation.  Whether or not she's

1    ultimately convicted is going to be a question for the jury.

2    But the fact that she has individuals in her life that want to

3    see her continue to be a healthy positive person while she

4    litigates this matter, I think, is something that should be

5    considered a positive factor, not a negative.

6          I'm certainly happy to discuss any of these factors I

7    put forward with the Court, any of Ms. Maddox's history either

8    prior to or since the alleged conduct period, but I think that

9    we've sufficiently rebutted the presumption, and I think that

10   we've set forth conditions that can reasonably assure the

11   safety of the community.  Certainly we're not saying that this

12   is a guarantee that nothing will happen -- there is no

13   guarantee -- but the standard is that it reasonably assures the

14   safety of the community, and I think that we have a battery of

15   conditions here that certainly do reasonably make that

16   assurance.

17         THE COURT:  All right.  Mr. Gappa, to rebut the

18   presumption, all that the defendant must do is bring forward

19   some evidence as to the factors, and the defendant has argued

20   several of the factors; the family relationship, no prior -- no

21   prior issues with the law.  She had been gainfully employed for

22   a significant period of time.  Why is that not rebutting the

23   presumption?

24         And then secondly, I'd like you to clarify for me, you

25   said something about her -- the defendant reestablishing the

1   contact with the individual in Florida.

2           MR. GAPPA:  Correct.

3           THE COURT:  And give me a timeline on that --

4           MR. GAPPA:  Sure.

5           THE COURT:  -- as well.

6           MR. GAPPA:  Your Honor, first, in response to the

7   presumption, I think I go back to Judge Reinhardt and his very

8   insightful and in this instance well-written decision in *United*

9   *States v. Hir*, which is H-I-R.  And the citation is 517 F3d,

10  1081.  And then specifically at page 1086 he said, quote, "The

11  presumption is not erased when the defendant proffers evidence

12  to rebut it, rather the presumption remains in the case as an

13  evidentiary finding militating against release to be weighed

14  along with other evidence relevant to the factors listed in

15  3142(g)."

16          So the presumption remains and it militates against

17  release.  So to the extent that she's presented these

18  additional facts for the Court's consideration, we don't think

19  the Court shouldn't consider them; the Court can consider them,

20  but it doesn't mean that if she puts forward three or four

21  facts in her favor that that eviscerates the presumption.  The

22  presumption, as the Court noted, remains and it's against

23  release.  So on the issue of reestablishing contact, these

24  communications that were given to the Court and counsel last

25  night, this, again, is just an excerpt.  It doesn't represent

1   the universe of communication because it's clear by the time

2   that the first communications that are referenced here, which

3   appear to have happened on November 24th of 2015 are taking

4   place, they had already communicated with each other.  But

5   there's a period on November 24th, 2015, when they are

6   communicating she appears to receive some child pornography

7   from the individual in Florida.  She states there, "I'm feeling

8   a little guilty."  She says, "I always want to see it," meaning

9   the victim in Florida's genital or pubic area.  She's making

10  comments about it.  There are three days that go by and on

11  November 27th the defendant says, "Oh, baby, I wish I would

12  have been home.  I miss her sweet little pussy."  Then there

13  are several days that go by again.  On December 2nd, 2015, the

14  defendant says, "I know we both have lives outside of this

15  thing.  I just miss when I'm talking to you."

16          And so it is clear from reading this that there was a

17  point at which the defendant's chat partner in Florida was not

18  reaching out to her.  She sees him communicating online with

19  other people, and then she reinitiates communication with him

20  because, as she then says, "I need" -- and this is on December

21  2nd -- "I need some Scott and Sammy back in my life ASAP.

22  You're so sweet to me.  I can't wait for tonight."  And she's

23  talking about the prospect of this defendant molesting that

24  girl and sending the images to her.  So there was a period at

25  which they obviously had communicated.  They weren't

1    communicating every day, but it was the defendant who took it

2    upon herself to reestablish that communication, which

3    demonstrates her interest.  This is after she's later said that

4    she deleted the material because she felt bad about it.

5            There's one other note I wanted to bring to the

6    Court's attention from the Ninth Circuit decision that I

7    referenced.

8            THE COURT:  Yes.

9            MR. GAPPA:  And it's related to the electronic

10   monitoring.  Even Judge Reinhardt stated that there is still a

11   risk even if monitoring is in place and he's, in that decision,

12   referencing a First Circuit decision, on how ineffective

13   electronic monitoring can be.  And this is another quote:  "It

14   does not prevent a defendant from committing crimes within the

15   monitoring radius, and there's no reasonable way to assure the

16   defendant will not make impermissible stops or detours on his

17   way to places permitted under the circumstances.  And phone

18   monitoring could be evaded by the use of cellular and pay

19   phones."  And that was at a time when the technology was less

20   advanced, as it is today.

21           And the government's concern is not just speculative.

22   I personally have handled cases where defendants have cut off

23   monitors, I can provide the case numbers; but in one case, the

24   defendant cut off his monitor, went missing for several days,

25   had suggested that he was going to commit suicide, and he

1    eventually was returned to custody.

2            There was a different case where before an indictment

3    but while the State case related to the same conduct was

4    pending, the defendant absconded and went out of the United

5    States, ended up in Indonesia, a country with no extradition

6    agreement with the United States.

7            In a different case, after the search warrant was

8    done, a defendant absconded and went to Florida and then

9    wouldn't respond to law enforcement requests to follow up with

10   the investigation.

11           In yet another case before the Court here a defendant

12   was released.  There had been allegations of receipt and

13   possession of child pornography.  This defendant had been

14   released on conditions, including a third-party custodian.

15   Later jail calls revealed that that defendant had been

16   molesting a child in the residence while on pretrial release.

17   So these are not unfounded concerns.  And again, for the

18   reasons that we have referenced, we don't think there are any

19   conditions that could be put in place for this defendant.

20           THE COURT:  All right.

21           MS. HOPKINS:  Your Honor, if I may respond?

22           THE COURT:  Oh, yes, of course you may.  You don't

23   need to respond to the other cases.  I understand I'm looking

24   at each case individually and based on the factors that -- the

25   facts and the factors that are before me in this particular

1    case.

2           MS. HOPKINS:  Thank you, your Honor, although I didn't

3    want to point out that although the government may have had

4    some less than positive experiences, the government has also,

5    and Mr. Gappa in particular has had a defendant that he

6    prosecuted who was released and was out on pretrial release

7    conditions for four years without incident and continued out

8    even following a jury trial conviction and following a

9    sentence, and so not -- not all defendants are the same.  And

10   these allegations alone do not, in and of itself, make someone

11   a flight risk or a danger.  And while I don't disagree that the

12   presumption of innocence -- I'm sorry -- the presumption that

13   someone is a flight risk or danger applies in this case, I

14   think we have rebutted it.  And I do disagree that it is

15   something that continues to prevent the Court from ordering

16   release.  Although it may be something that continues to weigh

17   on the Court in terms of the balancing test of the factors, it

18   is not the most weighty factor, nor is the fact that she has

19   these allegations pending against her the most weighty factor.

20          We've presented --

21          THE COURT:  What is the most weighty factor, then, in

22   your opinion?

23          MS. HOPKINS:  Well, your Honor, I think in this case

24   the most persuasive factor and perhaps the most weighty is that

25   she's had an intervening period of 18 months of positive

1    conduct with no indication that she continued to engage in any

2    illegal activity.  I think that that -- not only is that the

3    most persuasive, but it should be the most weighty.  That

4    intervening period is distinct to Ms. Maddox, but it also, I

5    think, demonstrates the lack of danger to the community, the

6    lack of ongoing future danger that she may pose.

7            Again, I recognize that the government is concerned

8    that the location monitoring available in our district is not

9    absolute; however, as I proposed, the Court can fashion a

10   condition that she not travel outside of the prescribed area of

11   her home or the portage of her home absent a third-party

12   custodian with her at all times.

13           Our office certainly can arrange for meetings with her

14   in the prescribed area in her home.  I don't need to have her

15   travel, necessarily, to my office for the purpose of visits and

16   so, therefore, her travel can be limited to the purposes of

17   attending counseling in the accompaniment of a third-party

18   custodian approved by the Court.  And again, that's -- at this

19   time there is no counseling currently scheduled.  We don't have

20   plans for her to be leaving the home in the immediate future

21   and any -- any proposed counseling, any proposed visits would

22   need to be approved individually on a case-by-case basis by

23   pretrial services.

24           And if the Court is particularly concerned about that,

25   we can bring each and every one of those requests before the

1    Court for an individualized and particularized analysis to

2    determine whether or not it is appropriate for her to leave the

3    home for those purposes.  I think that the Court has at its

4    discretion the ability to fashion conditions that would

5    reasonably assure the safety of the community and should do so

6    not only because it complies with the Bail Reform Act, which

7    states that release should be the standard, not the exception,

8    even in cases such as this where we have rebutted the

9    presumption, but also because Ms. Maddox deserves an

10   opportunity to litigate her case and participate in her defense

11   because she has really only one factor weighing against her in

12   terms of the danger, and that is the allegations contained in

13   this case.  And when the Court questioned the government as to

14   whether or not she renewed her conduct, the government only

15   recited the same content that is already before the Court and

16   certainly doesn't contradict what I've already stated, which is

17   that after December of 2015 she did not engage in any further

18   conduct, and so the fact that she expressed remorse and then

19   two weeks later terminated the contact permanently isn't a

20   demonstration that she is willing to go back to that conduct.

21   I think it's just an example that she was expressing remorse

22   and then continued to feel that remorse and ultimately

23   terminated that relationship.  I think that the fact that it

24   did terminate and has not renewed in the last 18 months is a

25   demonstration that she does not pose a future risk to the

1    community, particularly to the victim alleged and identified in

2    this case who she's not only barred by law from having any

3    contact with by nature of the restraining order but also will

4    not be able to have contact with by virtue of the conditions

5    she'll be placed on and the location that she'll be residing

6    in.

7         Although I do encourage the Court -- I'm prepared to

8    submit, but I would encourage the Court if it has further

9    questions specifically of the third-party custodians to take

10   advantage of the fact that both are present here today.

11        THE COURT:  Before I move on any further, let me hear

12   from pretrial services if there's anything additional that I

13   should know of or you want to contribute.  Mr. Olson?

14        MR. OLSON:  Your Honor, I was just pulling up the

15   Title 18 because of some of the information that the U.S.

16   attorney brought up regarding the electronic monitoring service

17   that we offer here.  And under 3142(b), it just says that

18   defendants charged similar to the way the defendant is charged

19   says that "At a minimum, a condition of electronic monitoring

20   and each of the conditions specified in subparagraphs 4, 5, 6,

21   7 and 8," which are all contained in our recommendation.  I

22   wasn't aware that there was case law that made that

23   insufficient.

24        THE COURT:  I don't know.  What is the date of that

25   case you're citing?

1      MR. GAPPA:  Your Honor, the -- just to be clear, the

2  Ninth Circuit case I just cited wasn't specifically necessarily

3  on the precise issue of electronic monitoring.

4      Our argument is based on the amendments to the

5  statute, which did probably come after this case, but if --

6  it's -- the point is that when pretrial services here sets a

7  condition of electronic monitoring and then, for instance, says

8  curfew or -- it essentially has no way to know what is a

9  defendant doing when they're not at the residence.  That's not

10  something --

11      THE COURT:  That's true.  I think pretrial would agree

12  with you, and I agree with that.  When a person is not at the

13  residence, we don't know what they're doing, true?

14      MR. GAPPA:  Right.  So then they're -- the person is

15  being released and there's no electronic monitoring, so that's

16  where we think it falls out of compliance with the statute.

17      MR. OLSON:  And there are things that we do.  We do --

18  if somebody leaves for a medical appointment, we have them

19  submit their records.  If somebody leaves to -- we approve them

20  to go to a grocery store, we have them provide the receipts.

21  So there is some documentation as to what defendants are doing

22  when they're away from the residence, but we do not know what

23  they're doing on the way there or on the way home, but we

24  wouldn't know that if they were on GPS tracking either, your

25  Honor.

1      MR. GAPPA:  Which makes all the more salient Judge

2   Reinhardt's reference that there's no reasonable way to assure

3   a defendant would not make impermissible stops or detours on

4   his way to places permitted under the restrictions.  That's our

5   point.

6      MR. OLSON:  Other than that, your Honor, we have

7   nothing to add.

8      THE COURT:  All right.  All right.  Is there anything

9   further, Mr. Gappa?

10      MR. GAPPA:  Your Honor, just the very last summation,

11   which is, it's true that we don't have before us that she's

12   engaged in this conduct since approximately December of 2015.

13      On the other hand, if we go back and put it in its

14   context, 28 days ago nobody knew that this crime had been

15   committed.  Nobody knew the defendant in Florida had been

16   molesting children there and had been victimizing this person

17   in North Carolina, so there's a lot that we don't know.

18      The devices that were seized in Florida that led to

19   the identification of the defendant are still being analyzed.

20   The initial review led to some of the information that made its

21   way into the complaint.  Even after that was done, they took a

22   second look at some of the evidence and found what we submitted

23   to the Court yesterday.  So the devices seized from this

24   defendant are still being subject to forensic examination here.

25   So it cuts both ways.  The fact that there isn't more evidence

1    I don't think negates the seriousness and the weight that

2    should be given to the evidence that there is.  So with that we

3    would submit, your Honor.

4         MS. HOPKINS:  Your Honor, I would just posit that we

5    could -- we cannot live in a universe of unknowns, and we

6    cannot prove a negative.  And what we have here is no

7    demonstration that there was any ongoing conduct.  And

8    certainly the government is available or has at their avail the

9    ability to bring her back for a bail review should that --

10   should new information arise that indicates that there was

11   ongoing conduct, and we can deal with that at that time; but

12   otherwise, I think what the government puts forward is, indeed,

13   a universe of problem things to address, whether or not there

14   is something out there that they don't yet know about.  We

15   would put forward that there is not.  We don't anticipate

16   coming back here with any new information.  And certainly the

17   government does have the hard drive.  They did have the ability

18   to do an initial cursory search and forensic review, and that

19   doesn't take great deal of time.  And Ms. Maddox has already

20   been in custody in Madera prior to appearing in this case, and

21   so I think we can assume that there isn't.  And if that turns

22   out not to be the case, then we can come back; but at this

23   time, based on the information we have now, I think there is no

24   indication that Ms. Maddox poses a future danger to her

25   community.  And the only indication that that might not be the

1    case or that might be the case that she does, in fact, pose a

2    danger are these allegations, and those alone are not

3    sufficient to detain her in light of all of the other factors

4    we put forward.

5            And again, I know that the government is concerned

6    that location monitoring is inadequate, but I think that we can

7    fashion conditions and specify the terms of those conditions so

8    that they are, in fact, adequate.  And at this time we are not

9    proposing that Ms. Maddox leave to go grocery shopping.  She

10   won't need to go grocery shopping.  We're not proposing even

11   that she leave for any appointments at this time.

12           And if the Court wishes, we can have an individual

13   determination as to those trips, if that is of particular

14   concern to the Court.

15           However, we have seen defendants in the past facing

16   these same allegations who have succeeded on release, who have

17   succeeded to the point where ultimately their location

18   monitoring was removed altogether.  And I'm not proposing that

19   that be not a condition in this case.  I just propose that the

20   Court give Ms. Maddox an opportunity to demonstrate that she,

21   in fact, can comply with those conditions and those conditions

22   are indeed sufficient.  And with that I would submit.

23           THE COURT:  Submitted?

24           MR. GAPPA:  Yes.

25           THE COURT:  This is a rebuttable presumption case.

1    And given that it is a rebuttable presumption and the defendant

2    has put forth some factors to rebut part of the presumption,

3    the -- but it does not negate the seriousness of the charges.

4    And while charges -- while the defense has argued that the

5    charges alone are not sufficient in order to detain her, I

6    agree with Mr. Gappa that the rebuttable presumption does not

7    disappear, and it remains a factor for the Court to consider

8    here.  Statutorily a rebuttable presumption, a presumption of

9    flight and danger being a concern this -- the seriousness of

10   the charges that are against this particular defendant and the

11   fundamental breach of trust I cannot see that there would --

12   could be conditions upon which she could be released and,

13   therefore, she will be detained not as a flight but as a

14   danger.

15          Now, do we have a -- anything else in this matter we

16   need to address?

17          MR. GAPPA:  Your Honor, I believe we have the next

18   court date.  It's July 7th.

19          THE COURT:  July 7th?  Okay.  All right.  All right.

20   Thank you.

21          MR. GAPPA:  Thank you, your Honor.

22      (Off-the-record discussion.)

23          MR. GAPPA:  Your Honor, just to complete the record,

24   if I could go back, we did in our submission, which is not part

25   of the record, ask that we include the attachment or

1    attachments.  So I would ask at this time if the Court still

2    has it to include those but that they be sealed?

3              THE COURT:  Right.  If you want to submit a sealing

4    order for me --

5              MR. GAPPA:  Right.

6              THE COURT:  -- I'll sign that.

7              MR. GAPPA:  Okay.

8              THE COURT:  Okay.

9              MR. GAPPA:  Thank you, your Honor.

10             THE COURT:  All right.  Thank you.

11        (Concluded at 2:44 p.m.)

12

13                      C E R T I F I C A T E

14

15        I, court-approved transcriber, certify that the foregoing

16   is a correct transcript from the official electronic recording

17   of the proceedings in the above-entitled matter.

18

19

    _/s/ JENNIFER L. COULTHARD_                June 26, 2017

20                                             DATE

21

22   JENNIFER L. COULTHARD, RMR, CRR
     Official Court Reporter
23

24

25