UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DROZD, JUDGE

```
UNITED STATES OF AMERICA,    )
                             )
         Plaintiff,          )   No. 17-CR-167-DAD
                             )
vs.                          )      MOTION TO REVOKE
                             )    ORDER OF DETENTION
ASHLEY MADDOX,               )
                             )
         Defendant.          )
_____)
```

Fresno, California              Monday, July 24, 2017


REPORTER'S TRANSCRIPT OF PROCEEDINGS


KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:        United States Attorney's Office
                          BY: **DAVID GAPPA**
                          2500 Tulare Street
                          Suite 4401
                          Fresno, California 93721


For the Defendant:        Federal Defender's Office
                          BY: **MEGAN HOPKINS**
                          and **VICTOR CHAVEZ**
                          2300 Tulare Street
                          Suite 330
                          Fresno, California 93721

1    Monday, July 24, 2017                    Fresno, California

2    11:43 a.m.

3         THE CLERK:  The Court calls case 1:17-CR-00167.

4    United States versus Ashley Maddox.  Motion to revoke order of

5    detention.

6         MR. GAPPA:  Good morning, Your Honor, David Gappa for

7    the United States.

8         MS. HOPKINS:  Good morning, Your Honor, Megan Hopkins

9    here with Ashley Maddox, who is present in custody and seated

10   at counsel table.

11        THE COURT:  And the motion -- or the matter is on

12   before the Court on the defendant's motion to revoke the

13   detention order, which was filed July 7th.  I've reviewed it.

14   The government's opposition filed July 17th and the defense

15   reply filed July 21st.  I've reviewed the original and

16   supplemental pretrial services report, the criminal complaint

17   and the transcript of the detention hearing before Magistrate

18   Judge McAuliffe.

19        Is there anything else that I should have read in

20   connection with the motion?

21        MS. HOPKINS:  No, Your Honor.

22        MR. GAPPA:  No, Your Honor.

23        THE COURT:  I think it is a difficult question that's

24   posed by this case potentially.  There's a few things that I'm

25   not entirely clear on that may affect how I assess the factors

4

1   eventually.

2        But the two things that I think I have some questions

3   about are the nature of the photographs and videos referred to

4   in the criminal complaint at pages, I think it's five and six.

5   Yes.  Five and six of the criminal complaint.  There was

6   a -- in the government's opposition, there was some discussion

7   about the nature of those materials.  I thought there was a

8   suggestion that they had been submitted under seal.  Maybe I

9   was misreading.  I went to the documents that had been filed

10  under seal just to see what was there.  And at least what I

11  was pulling up was not the materials reflected on pages 5 and

12  6 of the complaint.  So one, I've got a question about that so

13  I have a better understanding of exactly what it is alleged

14  that Ms. Maddox has done.

15       And then my second question is that I -- and that

16  could be determinative to me as to how I view whether

17  there's -- subjecting the question to de novo review, as I

18  believe that I must, whether or not I believe that the defense

19  has established -- has rebutted the presumption with respect

20  to danger.

21       I will say -- I will also say I don't see it as a

22  flight risk case.  I see it as a -- it will ultimately, I

23  think, be determined based upon the Court's assessment of

24  whether the presumption of dangerousness has been rebutted

25  and, if so, whether conditions can be imposed that would

1  reasonably establish that the defendant's release would not

2  pose a danger to the community.

3          But my second question along those lines is if the

4  first issue, the question of the photos or videos that were

5  sent by Ms. Maddox, if that doesn't determine the question in

6  my own mind, then my second question is that I would assume

7  that both her daughter and, I think it was a niece, but the

8  two juveniles that were residing with her in 2015 at the

9  time -- it's clear to me that they've been obviously removed

10 from her custody at this time.  But I would also assume that

11 they've been interviewed by law enforcement by this time.

12          So I am curious as to whether there's any indication

13 in any of those followup interviews of molestation or other

14 inappropriate conduct from December of 2015 all the way

15 through Ms. Maddox' arrest in June of 2017.  Maybe right after

16 the arrest that hadn't been done, but I would expect by this

17 time that certainly efforts have been made to do those

18 interviews.  And, in fact, probably other investigation to

19 delve into whether there's any other evidence of Ms. Maddox

20 engaging in sexual misconduct towards minors during that

21 period of time.

22          So those are the two areas that I'm most interested

23 in.  But with that, I'll hear from the parties.  Ms. Hopkins,

24 it's your motion, is there anything else you want to argue to

25 me?  I've read all the papers.  Everybody's certainly made

6

1     their arguments.  But I'm happy to hear about anything else

2     you think I should be considering.

3            MS. HOPKINS:  Yes, Your Honor.  Just briefly.

4     Certainly happy to address the Court's two questions.  I think

5     they might be primarily directed at the government, but I have

6     information I'd like to provide as well.

7            But apart from that, I did want to direct the Court

8     to a District Court decision in *United States versus Thayer*.

9     It was in 2008 in the Northern District of California.  And

10    that's CR-07-0812-DLJ.  That case deals with very similar

11    facts to this case.  It deals with an individual charged with

12    receipt and distribution in which the government also alleges

13    there was contact with a minor.

14           In that case, there were a number of intercepted or

15    directed online chat conversations, dialogue conversations

16    between the defendant and an undercover agent, in which the

17    defendant expressed desires towards minor children and in

18    which the defendant expressed that they had engaged in some

19    conduct with minor children.

20           And in that case, the Court held that evidence of

21    computer dialogue sessions with undercover agents are

22    questionable evidentiary value because they largely depict

23    fantasy conduct.  These conversations online are designed to

24    engage in fantasy sexual engagement and are not terribly

25    probative of particular sexual interest in children.

1          In that case, the pretrial services office proposed

2    very similar conditions of release to what are being proposed

3    here.  However, I would note that there are two distinct

4    differences.  Although they also propose electronic

5    monitoring, home confinement, no access to internet or

6    computers.  In that case they did recommend a monetary or

7    financial bond, but they did not recommend any third party

8    custodians.  And I think that that makes the recommendations

9    in this case more stringent.  And in that case, the defendant

10   was released on those proposed conditions.

11         In this case, we are also proposing two third party

12   custodians both of which are suitable custodians because they

13   have no criminal record, they have sufficient relationship

14   with Ms. Maddox.  They've been briefed by our office and

15   pretrial services about the responsibilities that entail.

16         I wanted to point out that one of them, Jennifer

17   Reeves, who is Ms. Maddox' older sister is present in court,

18   she's seated in the first row here on the right side of the

19   courtroom.

20         And I just -- I think it's important to note that

21   although these charges are serious, the fact that these

22   charges alone have been alleged cannot be a basis for

23   detaining any defendant who faces these charges.  Ms. Maddox

24   is probably one of the best situated defendants to face the

25   issue of detention under these types of charges.  She has a

1    longstanding history in this community.  She has practically

2    no criminal record apart from a minor traffic incident.

3         She has a very lengthy intervening period between the

4    alleged conduct here and today.  And to me, that alone would

5    substantially -- or sufficiently rebut the presumption.  The

6    fact that there is absolutely no evidence that since December

7    of 2015, she's engaged in any illegal conduct, that she

8    departed from that alleged conduct of her own volition, and

9    that she has changed the structure of her lifestyle and who

10   she associates with dramatically since that time.

11        Although I think that we further rebut the

12   presumption based on the fact that she has substantial -- in

13   fact, all of her ties are to this community in the Eastern

14   District of California.  She has family and a loving

15   partnership here.  Her children are here.

16        It is true, and I think supports a finding of

17   release, that there is a restraining order preventing her from

18   having any contact with the alleged victim in this case, her

19   daughter.  And there are no children, specifically no minor

20   children residing in the home.  And there will be no minor

21   children visiting the home.  Even in the care of a guardian

22   over 18.

23        We're not proposing any augmentation of these

24   conditions that would allow for that.  We're asking for strict

25   conditions because we feel that those are what would

1    reasonably assure the safety of the community in this case.

2           Apart from that, I think I certainly can reiterate

3    the arguments I made both in my brief and in my reply, but in

4    the interest of expediency, I will allow the government to

5    take over and respond to the Court's concerns.  And I'll

6    certainly address those in my own turn.

7           THE COURT:  Mr. Gappa, anything that you want to

8    argue in addition to what's in the opposition?

9           MR. GAPPA:  No, Your Honor.  I would just briefly

10   highlight a few points that I think the Court would have read

11   that I'd like to emphasize.  And they are that in the

12   government's view, we don't read this pretrial services report

13   as one for a recommendation for release because -- or if it

14   does, it would not be a sound recommendation because I believe

15   the report acknowledges that the pretrial services office here

16   does not consider, in fact, or enter into its assessment the

17   presumption.  And they've equivocated as to whether or not

18   there is a presumption.

19          I think the Court can clearly apply the law and find

20   that there is a presumption.  But that's one caveat.  As well

21   as the inability or unwillingness to take into account the

22   nature and circumstances of the offense.  And I'm not

23   criticizing the pretrial services office, I'm just

24   highlighting that those two important factors, which the Court

25   notes have to be considered, haven't been factored in to the

1  assessment of whether or not there are conditions that could

2  be fashioned.

3      So I think that needs to be put into its proper

4  context.  And it affects the weight to be given to the release

5  recommendation to the extent it says that it's a

6  recommendation for release.

7      We do highlight for the Court the reference in the

8  complaint affidavit that when the investigators initially

9  contacted Ms. Maddox, she denied having photographed the

10  children or having any knowledge of the photographs.  It's

11  understandable that she would not want to make that admission,

12  it would be incriminating.  It's her right not to incriminate

13  herself.  On the other hand, it is something that I think the

14  Court needs to look at in terms of ability or willingness to

15  tell the truth.

16      In our view, she did take the photographs.  I'm not

17  sure if I've understood the precise question of the Court that

18  was identified.  But I believe the Court does not have the

19  photos that are referenced in the affidavit.  And to the

20  extent that that was a suggestion, I apologize for that, Your

21  Honor.  What I believe the Court has and what my memory is of

22  what was sealed were the chat communications, but I don't

23  believe --

24      THE COURT:  Right.

25      MR. GAPPA:  -- there are any photos that were put

1   into the record.

2           THE COURT:  Are they in the government's possession?

3           MR. GAPPA:  Yes.  And I did ask the case agent if he

4   could be here.  He was out on surveillance this morning.  But

5   I don't personally have them.

6           THE COURT:  Okay.

7           MR. GAPPA:  I try not to keep those.

8           THE COURT:  Have you viewed them?

9           MR. GAPPA:  Yes.

10          THE COURT:  Do they depict sexual molestation?

11  I -- you know, I've read what's been said about them.  And

12  maybe it's -- maybe it's not -- maybe it's the government's

13  position that it's not relevant.  But I'm interested in

14  whether they are lewd and lascivious or whether they

15  depict -- whether they're pornographic, whether they depict

16  sexual activity.  And I wasn't sure from the contents of the

17  affidavit, what is it being alleged that the -- that Ms.

18  Maddox sent?

19          I think it's -- because if they're of a certain

20  nature, then I -- there is almost no question in my mind that

21  I would adopt the detention order.  On the other hand, if they

22  are -- if they do not depict sexual activity, rather the

23  argument is they're lewd and lascivious, I think I'd probably

24  keep proceeding with my analysis.  I don't know if that's

25  helping at all for you to understand how I'm sort of working

1    my way through this.

2           Can you make any representation in that regard?  I

3    don't necessarily need nor desire to see the photos

4    themselves, all I want to know is, hey, what is the government

5    alleging that they depict?

6           MR. GAPPA:  Sure.  I understand the Court's question

7    now, Your Honor.  And in paragraph 11 of the affidavit at page

8    five, there's reference to a series of files where there are

9    still and video images.  There's reference to one photo where

10   the victim's -- and it's a female victim -- shorts are pulled

11   to the side and her underwear is visible.  And that the

12   primary focus is on her vagina.

13          There's a video where the -- it's our view that it's

14   the defendant's finger is run alongside of that young girl's

15   vagina and over her shorts.  So in our view, that is the basis

16   for a charge that the Madera County District Attorney's Office

17   sought.  It's my understanding that they filed criminal

18   charges against the defendant which were considered contact

19   offenses based on this material.  And in part, based on

20   further investigation.

21          When they -- they being law enforcement -- realized

22   where those were created, it turned out they were done in

23   Fresno County, not in Madera County.  But there were charges

24   that had been filed based on that.  And it is my memory that

25   it was based on the acts against a minor.  And it was that

1 | material that was the basis for those charges.

2 |       MS. HOPKINS:  Your Honor, if I may.

3 |       THE COURT:  Well, I'll get back to you.

4 |       Go on, Mr. Gappa.

5 |       MR. GAPPA:  And so it is our belief that some of the

6 | material would be a federal statute, argued ultimately that it

7 | is a lewd or lascivious depiction of a minor engaged in

8 | sexually explicit conduct.  But there is no physical contact

9 | by any other person.  There are some of those still or video

10 | images.  But that these described in the paragraph that I

11 | referenced, in 11, that at least in that one video, there is

12 | actual contact by the defendant with the victim.

13 |       THE COURT:  All right.

14 |       MR. GAPPA:  And that in at least, I believe, one

15 | other photo, although you may not see a hand, it would appear

16 | that, based on the circumstances, that clothing had been

17 | removed to a certain extent and put into a certain position

18 | that would depict a lewd or lascivious exhibition, would

19 | display the genital or pubic area.

20 |       So I have never been a state prosecutor, I don't know

21 | whether in that category of image whether that would be

22 | sufficient if the image itself doesn't show the contact.  But

23 | that's the best description I can give.

24 |       THE COURT:  Okay.

25 |       MR. GAPPA:  But, Your Honor, we believe also that

1   although everything that the defendant points to may be true,

2   unfortunately there is another part of the defendant.  And

3   that's the one that we're concerned most about.  The defendant

4   would suggest that at about age 28, with no prior indication

5   of any deviance, that she suddenly and for a very brief time,

6   did what's alleged in the complaint and the indictment.  And

7   that she then was able to disassociate herself from that

8   activity and has no interest in it at all.

9        We don't believe that that's consistent with the

10  facts or with human nature.  There is one article that I think

11  the Court would have read.  And I just wanted to point out one

12  part of that.  It was, in the government's view, an

13  interesting reference on page two of seven.  This is a

14  psychiatrist who's being quoted.  And it says, "Other

15  pedophiles are good people who are struggling."  And this is

16  the person who's at John Hopkins Sexual Behaviors Consultation

17  Unit.  He goes on to say, "They're tortured souls fighting

18  like heck not to do this."

19       And it was just an interesting reference to the

20  defendant's choice of words.  She didn't say "tortured," but

21  she said, "I'm tormented.  Can you imagine the torment when I

22  see these young girls and their body parts?"

23       So it was just an interesting connection.  And it

24  also highlights that in many respects, many offenders are able

25  to have other relationships.  And in many, if not most other

1   aspects of their lives, they have what appears to be a normal

2   set of circumstances.

3        So we're not saying that any of that is not true.

4   It's just that, unfortunately, there's another aspect which

5   has caused her to be charged with these crimes.  And that's

6   what's of most concern to the government.

7        And I think also it's important that in the Ninth

8   Circuit decision, which we cited more than once, the *Hir*

9   decision, Judge Reinhart noted that it's not just a

10  presumption that the person is a flight risk or a danger, but

11  that there are no conditions that could be fashioned.  It's a

12  little bit more encompassing.  And it's not something where if

13  the defendant comes forward with some evidence, that the

14  presumption disappears or is eviscerated, rather it stays in

15  place throughout the remainder of the analysis and it has to

16  be factored in.

17       So to the extent that there is evidence and that

18  there are factors that weigh in the defendant's favor, it

19  doesn't mean that that presumption isn't still in place.  So

20  for the reasons that we've argued in our filing, we don't

21  believe there are conditions that would reasonably assure the

22  safety of the community.

23       THE COURT:  How about my question regarding any

24  investigative efforts with respect to the time period from

25  December of 2015 to the present?  Is there any evidence that's

1   been developed that Ms. Maddox has engaged in criminal

2   activity having to do with the exploitation of minors or

3   sexual contact with her own daughter or the niece?

4           MR. GAPPA:  None of that was recovered.  I've asked

5   the agent again about the forensic interviews.  I haven't

6   gotten a response yet.  In other words, the forensic

7   interviews of the victim.

8           THE COURT:  Right.  I mean, I would assume what

9   they -- the defendant was arrested, what, about four weeks

10  ago?

11          MR. GAPPA:  Right.

12          THE COURT:  I would assume that efforts would have

13  been made during that period of time to talk to the minors

14  unless somebody said, "No, we don't want them -- I don't want

15  my daughter or niece or whatever interviewed."  I would have

16  thought that by now they probably have decided whether they

17  uncovered anything there.  Or at least, no, we couldn't

18  because we couldn't get cooperation.

19          MR. GAPPA:  I agree.  I think that's a reasonable

20  assumption.  I think that is their practice.  And I've asked

21  the agent if he could either come here in person or email me a

22  response.  And so far I haven't seen anything.

23          THE COURT:  All right.

24          MS. HOPKINS:  Your Honor, if it's helpful, we are

25  aware that the -- that Ms. Maddox' daughter was interviewed in

1   Madera County just two days after her arrest on June 5th.  And

2   that during that interview, there's no indication of

3   molestation.  In fact, the alleged victim in that case denies

4   several times anything unusual happening at the home, having

5   any concerns she wants to express, other than a fear that she

6   doesn't know where her mother is and that she's in foster care

7   at the time.

8           THE COURT:  How old is she now?

9           MS. HOPKINS:  11 years old, Your Honor, I believe.

10           THE COURT:  And how about the other minor who was in

11   the home?

12           MS. HOPKINS:  Your Honor, the niece that you're

13   referring to is Ms. Reeves' daughter.  I'm not sure, I didn't

14   receive a copy of any interview --

15           THE COURT:  All right.

16           MS. HOPKINS:  -- of that child.  Although I don't

17   believe there's any allegation that she was involved.

18           THE COURT:  Okay.

19           MS. HOPKINS:  I do want to speak to the --

20           THE COURT:  Let me ask.  Mr. Gappa, were you done?

21           MR. GAPPA:  Yes.

22           THE COURT:  All right.

23           MS. HOPKINS:  As to the contents of these images that

24   were allegedly produced by Ms. Maddox, none of them contained

25   any depictions of molestation.

1        THE COURT:  You've seen them?

2        MS. HOPKINS:  No.  I -- I'm going to be viewing them

3   with the agent tomorrow.  I have seen some of them.  A copy of

4   all the images was provided to Ms. Maddox in court, in

5   dependency court by the government.  And I think that speaks

6   to the fact that the government in its own assessment in

7   Madera County did not view these items as contraband.  They

8   provided her a copy of them right in dependency court.

9        The single video that the government refers to that

10  has a depiction of a hand near the genital area of the alleged

11  victim doesn't, by my understanding, doesn't clearly depict a

12  touching.  And also --

13       THE COURT:  Let's wait just a second.

14     (Off the record.)

15       THE COURT:  Yes.  Mr. Gappa, was there some -- did

16  the agent come?

17       MR. GAPPA:  He's outside.

18       THE COURT:  All right.

19       MR. GAPPA:  And -- yeah.

20       MS. HOPKINS:  Should I continue or --

21       THE COURT:  You may.

22       MS. HOPKINS:  There is --

23       THE COURT:  I just didn't want you to keep arguing

24  with Mr. Gappa out of the room.  I thought Mr. Carbajal was

25  over there at one point and then I leaned around and realized

1  he was gone, so --

2              MS. HOPKINS:  I understand.  There are no depictions

3  of penetration.  No depictions directly of her genitalia.

4  No -- nothing that would constitute contact or molestation.

5  And I think questionably whether or not they even depict

6  sexually explicit material.  These are photographs, by my

7  understanding, that in another context would just be pictures

8  of children.  But are alleged to have been sent for the

9  purpose of some sexual gratification.  But in and of

10  themselves, in a vacuum, do not contain sexually explicit

11  content whatsoever.

12             THE COURT:  All right.  Anything else?

13             MS. HOPKINS:  With regard to these images and the

14  interview of the alleged victim, no, Your Honor.  Although I

15  do believe that even if these images -- which they don't, but

16  if they did depict some form of molestation, I don't believe

17  under the law the Court could rest its inquiry there.  I think

18  that the seriousness of the danger factor has to do with new

19  criminal conduct.  Future danger.  And so the inquiry must

20  persist.

21             THE COURT:  I understand that.  But if evidence were

22  to come forward that in December of 2015, a defendant molested

23  a child and is now charged in 2017 with a child pornography

24  offense, that would make the presumption of danger much more,

25  much more difficult to overcome.

1          MS. HOPKINS:  I certainly agree with that, Your

2    Honor.

3          THE COURT:  So that's why I ask.

4          Mr. Gappa, I would say -- I do think that the

5    supplemental report from pretrial services did acknowledge and

6    take into -- acknowledged, at least, the rebuttable

7    presumption.  It may not have -- it may have viewed that the

8    rebuttable presumption was for the Court, perhaps, to weigh

9    and therefore worded it the way it did.  I see what you're

10   saying that in the recommendation, it says "apart from

11   consideration of the weight of the evidence and rebuttable

12   presumption for detention," but it did acknowledge it.  It may

13   just not have weighed in on how the Court ought to assess

14   that.  But it's definitely a rebuttable presumption case.

15         I'm still very much interested in the nature of the

16   photos that the defendant -- or videos that the defendant sent

17   and how graphic they are, or not.

18         And two, as to the status of any investigation

19   regarding unlawful conduct of any kind in the interim.  Or

20   even troubling conduct in the interim.

21         I mean, the defense has taken the position that,

22   look, judge, since December of 15, there's nothing.  So

23   if -- and it does seem to me that it would not be unreasonable

24   to think that if there was something, we should by this time,

25   four weeks out, have some lead or possibility that, yeah,

1   we're concerned because here's what -- you know, here's what

2   we've learned in the interim.  That's of issue to me.

3           MS. HOPKINS:  I would like to correct, just for the

4   record, that Ms. Maddox was taken into custody on June 5th.

5   And so I believe we're nearly seven weeks out at this time.

6           THE COURT:  Okay.  I was thinking it was late June.

7   That's when she got here?

8           MS. HOPKINS:  No.  June 5th is when she was taken

9   into custody in Madera County.  She got here on --

10          THE COURT:  Right.

11          MS. HOPKINS:  -- June 21st.  Although the agent

12  involved in the case was involved on June 5th.

13          THE COURT:  I was going off of the date she was

14  brought here, the detention hearing was June 23rd.  You tell

15  me she was actually in state custody before that?

16          MS. HOPKINS:  Yes, Your Honor.

17          THE COURT:  Anyway, those two things continue to

18  concern me.  If, let's say, I considered them and decided that

19  in my view, at least, considering everything that's in front

20  of me, the presumption has been rebutted, are the two proposed

21  third party custodians, are they willing to sign off on any

22  unsecured appearance bond?

23          MS. HOPKINS:  Your Honor, it's my understanding that

24  they do not have the finances.

25          THE COURT:  I thought they worked.

1        MS. HOPKINS:  They do work, Your Honor.  But --

2        THE COURT:  That's good enough for me.  Anyway, I'd

3   want to know that.  As well as anything about their financial

4   wherewithal.

5        And my other question is in the opposition, or in the

6   motion, I think there was a suggestion about -- issues were

7   being raised about whether the conditions of release were all

8   based upon the defendant's good faith cooperation and

9   compliance.  I think that the defense proffered or offered a

10  condition that in those instances when, with pretrial

11  services' approval, Ms. Maddox were allowed -- if she would be

12  allowed to leave the residence, that she would be accompanied.

13  Am I making that up or did you --

14       MS. HOPKINS:  No, Your Honor.  That is correct.  I

15  proposed that in response to the government's concerns.  But

16  also, I -- I've since taken a closer look at the Court's

17  concerns in *Hir* with relation to that.  And the good faith

18  compliance in that case that the Court is concerned about has

19  to do with the fact that in *Hir*, the defendant was alleged to

20  have been involved with a terrorist organization and had been

21  providing finances and materials there, in addition to sending

22  articles notifying the contact in the Philippines that they

23  were being sought by the United States government as a

24  terrorist, had been added to a terrorist watch list, had taken

25  efforts to conceal who they were, use concealed bank accounts.

1  This is an individual that's demonstrated a desire to conceal

2  themselves entirely and who has a network of individuals that

3  would support them in that effort.

4          And the Court also cites a case, *US v Tortora*, from

5  1990, dealing with a defendant who was a member of a Mafia

6  family who would go -- the Court assumed go to great efforts

7  to support that individual in circumventing the Court's

8  orders.

9          This is a case not at all like that, where you have

10 third party custodians and family members who are law abiding

11 individuals and no indication that Ms. Maddox made any attempt

12 to conceal herself.  In fact, even in the chats purported to

13 be from her that the government has introduced, she's chatting

14 openly notoriously on an application, using a name and email

15 address that had been associated with her for a long time.

16         So I think that, although it is important that the

17 defendant, who is released, act in good faith in compliance

18 with the Court orders, there's no question here as to Ms.

19 Maddox's ability to do that.

20         And to the likelihood that she has individuals in her

21 life that would support her in doing that, none of the

22 individuals that are in her life are the type that would be

23 willing to risk her freedom or their own in order to

24 circumvent the Court's order.  And I think that distinction is

25 very relevant.

1          THE COURT:  I think the concern was more that if she

2   was permitted to leave home, for instance, for an appointment

3   of some sort.  Not a legal appointment, because you'd know

4   whether she showed up or not or when she was supposed to.  But

5   if she was authorized to leave for some other appointment,

6   whether she would be accompanied or basically just be on her

7   own for whatever period of time she was attending an

8   appointment.  And actually, after conferring with pretrial

9   services, I think their usual practice is to request that

10  somebody in that situation be accompanied.

11          MS. HOPKINS:  Yes.  We're certainly amenable to that

12  order.

13          THE COURT:  That's what I was inquiring about.  I'll

14  get back to you, Mr. Gappa.

15          MS. HOPKINS:  And I've just conferred with my

16  co-counsel.  Ms. Reeves is willing to agree to an unsecured

17  appearance bond on behalf of Ms. Maddox.  And although I

18  haven't had an opportunity yet to speak to Mr. Hall, it's my

19  understanding he'd be willing to do that as well.  As long as

20  the Court would accept his employment and his history of

21  employment as sufficient.

22          THE COURT:  Mr. Gappa, I'm still interested in those

23  two points.  The nature of the photos and videos and what

24  we've learned about any subsequent conduct, if anything.  Do

25  you need some time to confer with your agent?

1          MR. GAPPA:  I do.  I have one answer.  And that is

2    apparently the forensic interview of her daughter was done.

3    There was no disclosure.  But I have, in response to that, in

4    addition to that another point if I could.  On the issue of

5    disclosure, it relates to this next point, nature and

6    circumstances of the offense.

7          It is not, in the government's view, surprising that

8    there wouldn't be a disclosure because when you look at the

9    communications between the person Scott Trader in Florida and

10   the defendant in, at the time, Fresno, there is reference

11   specifically in November and December of 2015 where, for

12   instance, the defendant says, "Has she been awake while you

13   did it at all?"  And then he says, "No, like I said, I have

14   been doing it much lately."  And then the defendant says, "I

15   would like her to be awake."

16         So it appears that at that point in the relationship,

17   that they're both recording images of -- well, I'll use the

18   word "molestation" in the sense that's sexual abuse.  They're

19   recording images of sexual abuse of children who are sleeping.

20   And then there's a discussion, and it's interesting that it's

21   initiated by the defendant of, "Hey, have you done this while

22   your victim is awake?"  He says "No."  She says, "I'd like to

23   see it when she's awake."

24         So it wouldn't, in the government's view, be

25   inconsistent with somebody who is recording the abuses that's

1 been described in the complaint affidavit where it's very

2 clearly stated that the victim is asleep.  So that's one

3 point.

4      And the other point, I did check with the agent.  I

5 asked him would he characterize any of the material that he

6 described as depicting molestation.  And he said yes.  So

7 rather than rely on that and representations from counsel who

8 has not seen the material, I think the best thing would be if

9 the Court were to actually see some of that material and then

10 it could have the best record available.  So we could do that

11 on fairly short time frame, even within the next hour.

12      THE COURT:  Okay.  I've got another matter, two

13 matters on at 1:30.  So -- but that sentencing now isn't

14 supposed to be two hours.  Right?

15      THE CLERK:  Correct.

16      THE COURT:  Because they've agreed to just argue.

17      THE CLERK:  Correct.

18      THE COURT:  So I think we'll be done by 2:30, don't

19 you?  With both of them?

20      THE CLERK:  I would agree.

21      THE COURT:  How about reconvening at 2:30?  Or if you

22 want to just -- once you know you've got the capability, if

23 you want me to either go somewhere, where you both are, to

24 view the photos or you want to bring -- whatever works best

25 for you, let Renee know how you'd like me to view the images

1 | and I'll do so.

2 |       MR. GAPPA:  Okay.

3 |       MS. HOPKINS:  Certainly.  We can be available at that

4 | time, Your Honor.  Although since the Court may close its

5 | frame of mind temporarily, I would just like to address the

6 | two points the government just made.

7 |       Which is, first of all, the -- what the Court -- what

8 | the government has recited to the Court is a discussion of

9 | another alleged victim in the case, not of Ms. Maddox'

10 | daughter.  They're not discussing any images depicting her

11 | daughter at the time.  And so I think that needs to be

12 | clarified.

13 |       Because the Court's question is directed to what has

14 | taken place with Ms. Maddox' daughter, the alleged victim in

15 | this case.  And these images that we're discussing are

16 | depictions of Ms. Maddox' daughter.  We're not -- it doesn't

17 | seem that this is relevant to those images transmitted from

18 | Florida.

19 |       THE COURT:  All right.

20 |       MS. HOPKINS:  And secondly, I would take issue with

21 | the government's characterization of these images depicting

22 | molestation.  I think --

23 |       THE COURT:  Well, I'm going to look.

24 |       MS. HOPKINS:  -- it's a stretch.

25 |       THE COURT:  I'm going to take a look.  I'm going to

1   be satisfied for myself as to what I think is depicted.

2   Because I think it makes a big difference.

3         MS. HOPKINS:  I certainly agree that it may change

4   the analysis with regard to the presumption.  Although I would

5   urge the Court to recognize that the issue has to do with

6   future danger.  Although I'm confident that upon the Court's

7   review the Court will be satisfied that they don't depict

8   molestation.

9         THE COURT:  All right.  Just as a housekeeping

10  matter, might as well get it out of the way now.  I don't know

11  whether it's happened on the docket, has the case been

12  reassigned to me?

13        THE CLERK:  It has.

14        THE COURT:  It has now.  And just so that there's

15  no -- so everything is transparent, as now has become such a

16  popular saying.  Judge O'Neill and I were at the Ninth Circuit

17  conference when the question came up of a motion to revoke, a

18  detention order gets filed, gets randomly assigned to a

19  district judge, followed by the return of an indictment which

20  then gets randomly assigned to a district judge.  Ends up the

21  two assignments are different, where is the motion supposed to

22  go?  Where is the case supposed to go?

23        I'm still relatively -- well, 18 months, I don't

24  know, 20 months, I consider myself relatively new to Fresno.

25  I said, "Look, however -- I don't care.  I've read the motion.

1   But Judge O'Neill, you'll be able to get up to speed very

2   quickly on it."  His office, in fact, had already started to

3   take a look as well because the indictment got returned and

4   got assigned.

5          And all the judges of the Court happened to all be in

6   San Francisco at the Ninth Circuit conference.  And at that

7   time, I was told that this issue had arisen in

8   2000 -- sometime, a couple of years ago, several years ago,

9   and that it was determined that in these circumstances, that

10  because the motion to revoke a detention order was randomly

11  assigned, that that random assignment would then govern.  And

12  that there would be an indication then sent to the clerk's

13  office that when the -- that accompanied the indictment that

14  says, "There's been an intervening motion to revoke detention

15  order, it's already been randomly assigned to district judge

16  number one, therefore the indictment should get assigned to

17  judge number one as well because the random assignment has

18  already been made."

19         I said I -- you know, I wasn't around then, I have no

20  idea what the procedure was that was agreed to.  Apparently

21  some of the other judges went back and uncovered email thread

22  communication between the US Attorney's Office, the Federal

23  Defenders Office and the judges who were here then saying,

24  yes, that's our agreed upon procedure.

25         And therefore, Judge O'Neill, as chief judge, with me

1   saying, "Look, I don't care, whatever the rule that you

2   followed in the past says, that's obviously what I want to

3   follow.  I have no idea."  And Judge O'Neill took a look at

4   the email thread and said, "Yes, that is the practice we

5   agreed to several years ago with agreement by both Federal

6   Defender and U.S. Attorney.  So I'm not hearing that motion to

7   revoke, Judge Drozd is and reassign the indictment to him."

8           So I just want it clear, if that wasn't already

9   clear, I was told by Judge O'Neill that there was some

10  communication about the reassignment.  But that's why the case

11  has been now assigned to me.

12          So in light of that, I understand from Renee that the

13  parties are requesting a status conference for September 11th

14  at one p.m. before Magistrate Judge McAuliffe.  And that time

15  be excluded from whatever the last exclusion of time was until

16  the September 11th date, I presume, in order to provide

17  defense counsel reasonable time to prepare.

18          MS. HOPKINS:  Yes, Your Honor.  We would agree to an

19  extension of the exclusion of time from September 5th to

20  September 11 to allow for that.

21          THE COURT:  And do you also represent that the

22  interest of justice compel that exclusion of time outweigh any

23  interest that Ms. Maddox and the public have to a speedy trial

24  to the extent of that exclusion?

25          MS. HOPKINS:  Yes, Your Honor.

1          THE COURT:  Based upon that representation, I'll

2    exclude the time all the way to the September 11th status

3    conference before Magistrate Judge McAuliffe and the matter

4    will be placed on her calendar at that time.

5          MS. HOPKINS:  Your Honor, before we conclude

6    this -- or before we recess this hearing to 2:30, I just

7    wanted to point out.  Ms. Reeves is here in court now.  She

8    came today in the event that the Court wanted to address her

9    and inquire as to her understanding of the responsibilities as

10   a third party custodian or any other questions the Court may

11   have regarding this hearing.

12         And so in the event that she needs to return to

13   work -- she's been here since ten a.m. -- I just wanted to see

14   if the Court wanted to take that opportunity before -- in the

15   event she's unavailable this afternoon.

16         THE COURT:  Well, pretrial services reports to me

17   that they've fully addressed the responsibilities of a third

18   party custodian, both to Ms. Reeves and to Mr. Hall, and that

19   they've both acknowledged that they understand their

20   responsibilities.  Ms. Reeves, you can hear me okay?

21         MS. REEVES:  Yes.

22         THE COURT:  You understand that as part of your

23   responsibilities, if your sister were to be released and that

24   you were named as a third party custodian, that you would be

25   responsible for knowing all the conditions that were placed on

1 her release, and you'd have a copy of those.  And that if your

2 sister violated any of the conditions that were imposed by the

3 Court, that it would be your responsibility to immediately

4 notify pretrial services of the violation.  You understand

5 that?

6          MS. REEVES:  I do fully understand that.

7          THE COURT:  Even though it's your sister and even

8 though it could result in her being returned to custody if she

9 were to be released.  And I don't know that yet.  But if you

10 were in that position, you'd -- would you really be able to do

11 that?  Knowing that it might cause your sister to go back into

12 custody.

13          MS. REEVES:  Yes, I would.

14          THE COURT:  I don't have any other questions.

15          MS. HOPKINS:  Thank you, Your Honor.

16          THE COURT:  We'll reconvene at 2:30.  Just be in

17 touch with Renee about when and where if -- I may even be done

18 before 2:30.  So if you want me to go somewhere to view the

19 photos, let me know.

20          MR. GAPPA:  Thank you, Your Honor.

21     (Recess from 12:33 to 3:00 p.m.)

22          THE CLERK:  The Court recalls case 1:17-CR-00167.

23 United States versus Ashley Maddox.  Motion to revoke order of

24 detention hearing.

25          MS. HOPKINS:  Good afternoon, Your Honor, Megan

1   Hopkins here with Ashley Maddox, who is present in custody,

2   along with my co-counsel Victor Chavez who are at counsel

3   table.

4           MR. GAPPA:  Good afternoon, Your Honor.  David Gappa

5   for the United States.

6           THE COURT:  All right.  And we continued the matter

7   to this time to hopefully both review the video and/or photos

8   that were referred to in the affidavit in support of the

9   complaint.  Because rather than to rely on a description, I

10  was interested in viewing them so I could make a determination

11  in my own mind as to what they reflect.

12          And then also to hear anything further about any

13  further investigation following the defendant's arrest in

14  early June with respect to any suspected conduct that she may

15  have engaged in between December of 2015 and the time of her

16  arrest in June of 2017.

17          So where -- and I hate to do this, but I've now been

18  called to an urgent meeting at 3:30.  So I may have to break

19  again.  Sorry.  Unless we can get it -- unless I can see --

20          MR. GAPPA:  Your Honor, I don't think it will take

21  that long.

22          THE COURT:  Okay.

23          MR. GAPPA:  And what I have -- and I've plugged in

24  our laptop, the government's laptop.  So I don't know if it

25  will connect.  And then if --

1          THE COURT:  If not, I'll just come down there and

2     look at it.

3          THE CLERK:  It's connected, Your Honor.

4          THE COURT:  It is.  It's going to be up on the

5     screen.  Okay.  I've apparently got it up here.

6          MR. GAPPA:  Your Honor, before going to the still or

7     video images, there were just a couple of things I wanted to

8     bring to the Court's attention.  And first, this is a screen

9     capture of what was a communication between the defendant, who

10    is using the screen name Ash M. and Scott Trader, who was

11    arrested in Florida.

12         THE COURT:  Yes.

13         MR. GAPPA:  And this content is recovered from

14    evidence seized in Florida.  And he had put some of the

15    communications that he had with Ashley Maddox on an SD card,

16    so a card that could go into and out of a phone.  That was

17    seized in his residence in Florida.  And this is one file that

18    was on that SD card.

19         THE COURT:  Yes.

20         MR. GAPPA:  And it says that, "I lied about one other

21    thing.  I just realized I do have a Facebook.  I just knew you

22    would realize I lied about my daughter if I told you."

23         And then she goes on to represent that her daughter

24    is age 7 and she says "both of the girls are 7."  If we assume

25    that this was in the fall of 2015, we could adjust the date.

1    But I don't know that that corresponds to the date that was

2    suggested.

3              But in any event, the point the government is making

4    here is that this is a reference to the defendant lying to

5    that person in Florida and admitting that she had lied.

6              Then I also wanted to point out --

7              THE COURT:  I think I've read these.

8              MR. GAPPA:  Okay.

9              THE COURT:  This is in -- this was either in the

10   complaint or in the government's motion.  Right?

11             MR. GAPPA:  Correct.

12             THE COURT:  Yeah.

13             MR. GAPPA:  There was one message, though, that was

14   not included there.  It's this one, which is another screen

15   capture.  But there's discussion about the defendant's access

16   to her daughter and the times that she has with the daughter

17   and sharing the custody of the child with the father.  And

18   this one message, the defendant says ultimately "that means

19   she's with dad tonight and tomorrow night.  We picked the

20   wrong week to start talking LOL."

21             But then if we look at images.  These are images that

22   the defendant created and then sent to Scott Trader in

23   Florida.  And there is also a video which depicts the

24   defendant's daughter, as well as this video, which shows the

25   defendant's hand making contact with the vaginal area of that

1   girl.

2          Based on the context of some of the other still

3   images, it appears that it's certainly possible that the

4   victim was sleeping.  However, in the government's view,

5   there's no doubt that there's actual physical contact there

6   because of the reaction of the victim when the defendant's

7   hand is touching her.  You can see the reaction with the legs

8   moving in response.

9          So in our view, that is conduct that is something

10  that would be considered molestation.  It could be charged, it

11  actually was charged under Penal Code Section 288.  But in any

12  event, it clearly, in our view, shows the sexual exploitation

13  of a minor and supports the view that she is a danger because

14  she's had contact with this girl.

15         And in reference to one of the last comments the

16  defense had made about -- so the Court is clear that when

17  the -- the communications were about "have you done this when

18  your daughter is awake?"  We agree, that's talking about a

19  different victim.

20         But in the government's view, that makes this

21  defendant more dangerous and the conduct more egregious,

22  because not only did the defendant do what she did with her

23  daughter, she was aware of what the person in Florida was

24  doing with his daughter and knew there was abuse going on and

25  didn't report it.  Which is one thing.  But then communicated

1   with that person that she was interested in seeing this.  And

2   then encouraged that person to do the abuse when the child was

3   awake.  Because she specifically referenced, you know, wanting

4   to see her vaginal area with her pants pulled down.

5          So for all of those reasons, Your Honor, we don't

6   believe there are any conditions that the Court could fashion

7   that would adequately mitigate the risk to the children that

8   she's expressed an interest in.

9          THE COURT:  And anything additional about any further

10  investigation regarding the last 20 months or so?

11         MR. GAPPA:  As mentioned, the defendant's daughter

12  was interviewed.  There did not -- there was no disclosure of

13  any abuse at that point.  And I don't know whether the

14  other -- the niece was interviewed.

15         MS. HOPKINS:  Your Honor, I can speak to that.  I

16  spoke with Ms. Reeves.  She was informed by the Madera County

17  agents that her daughter, which is Ms. Maddox's niece, would

18  not be interviewed because there was no evidence that there

19  was any involvement.  Ms. Reeves, on her own, spoke with her

20  child and there was no disclosure of anything untoward.

21         THE COURT:  All right.  Anything else that

22  the -- it's your motion.  Anything else you want to argue

23  before I rule?

24         MS. HOPKINS:  Yes, Your Honor.  Our position is that

25  these images don't depict molestation.  And that Ms. Maddox

1    did not molest her daughter.  In any event, I think that we

2    need to focus our inquiry here on whether or not Ms. Maddox

3    poses a future danger to the community or to anyone

4    specifically.

5          It seems to me what the government wants to say is

6    that anyone who's accused of these crimes, of crimes involving

7    sexual exploitation of minors, are so dangerous that the Bail

8    Reform Act shouldn't apply to them whatsoever or that the

9    presumption is not rebuttable in any way.  And that simply

10   cannot be the case.

11         There are -- there are crimes under the federal laws

12   relating to contact with minors and direct abuse of minors.

13   And even those cases are subject to the Bail Reform Act and

14   subject to release if any combination of conditions would

15   reasonably assure the safety of the community.  And Ms.

16   Maddox's case is far less serious than some of those.

17         I pointed the Court to *US versus Thayer* earlier.  And

18   I think that that case is illustrative of a similar

19   circumstance where an individual was released and where the

20   Court appropriately didn't afford great weight to the chat

21   sessions, because chat sessions are illustrative of fantasy

22   play and fantasy conduct and they don't necessarily

23   demonstrate an individual's specific appetite towards

24   children.

25         The government's attachments -- I'll take them in

1  turn.  The first attachment, the article describing a single

2  psychologist's view of pedophilia, I don't think applies here.

3  And the government is not in a position to know if Ms. Maddox

4  is, in fact, a pedophile.  And their implication, I think,

5  exceeds the scope of this congregation.

6         But in any event, Ms. Maddox has not been the subject

7  of an individual assessment.  We don't know at this time.  And

8  there's no way that the government could know what her

9  specific interests are with regard to children or whether or

10 not she was playing along with Mr. Trader because she sought

11 his attention.

12        Here, I think that we have sufficiently rebutted the

13 presumption that no combination of conditions could reasonably

14 assure the safety of the community.  I think that the very

15 lengthy period of intervening time where there is no evidence

16 that Ms. Maddox engaged in any unlawful conduct, certainly no

17 conduct relevant to these charges, and none whatsoever as far

18 as we're aware of is significant.  I think it's unusual, first

19 of all.

20        The government has tried to paint a picture that --

21 first of all, that she's a pedophile, which is not

22 established.  But also that something innate in her nature

23 makes her unable to stop herself from engaging in this type of

24 activity.  And they assert that that makes her especially

25 dangerous, so dangerous that no combination of conditions

1    could protect the community from her.  And that's simply not

2    the case.

3         She, on her own volition, elected to distance herself

4    completely from Mr. Trader, from the applications where she

5    had been communicating with him and to shift the focus of her

6    live entirely.  The government argues that it's not possible

7    for someone to have a spike of behavior like this.  And we

8    argue that it absolutely is possible.  And it is the case

9    here.  And it's demonstrated by the evidence.  If the

10   government had any indication this was ongoing, it would have

11   been presented to the Court.  And they simply don't.

12        What we need to look to under 3142(g) are four

13   different factors.  The nature and circumstances of the

14   offense certainly are very serious.  Are they the most serious

15   types of crimes we see?  Certainly not.  I think that the

16   Court in *Hir* looked at a case that was far more serious with a

17   significant ongoing future danger, that there would be further

18   support to this terrorist organization and the Court in *Hir*

19   expressed that concern.  And that's simply not the case here.

20        Arguably, the only danger is to Ms. Maddox' daughter.

21   Or perhaps to this individual, this young victim in Florida.

22   Both of whom Ms. Maddox has no ongoing contact with, no

23   ability to contact the individual in Florida and is restricted

24   by law from contacting her daughter here and has complied with

25   that.  The government has provided my office with, I believe,

1    more than 100 phone calls from the jail and in none of those

2    phone calls did Ms. Maddox indicate that she wanted to

3    circumvent that restraining order and find a way to

4    communicate with her daughter or violate the law or the

5    conditions that I discussed with her with regard to this

6    hearing in any way.

7          Ms. Maddox merely wants to go home.  To be able to

8    seek mental health counseling for her depression.  To seek

9    treatment.  And to participate in her defense in this case.

10          With regard to her history and characteristics.

11   Apart from this lengthy intervening period, which as I said I

12   think is significant and in and of itself could rebut the

13   presumption.  Ms. Maddox is a loving and caring individual.

14   She's responsible and law abiding.

15          Although she's not currently employed because her

16   employer elected to terminate her employment after being

17   advised of these charges, she was employed prior to that time

18   for eight years and had risen to a supervisory position in her

19   office.

20          She has significant family ties here.  Her entire

21   community is here.  Her mother, her sister, her partner, all

22   of her family is in the Eastern District of California.  She

23   grew up here between Fresno and Madera.  And has lived here

24   her entire life.  She has no ties to any other community.  She

25   has essentially no past criminal conduct apart from one minor

1    traffic incident.  And as I see it, poses no future danger to

2    anyone.

3         I think that that not only rebuts the presumption,

4    but weighs in favor of release.  Pretrial services office made

5    a recommendation in this case of release.  I understand the

6    government's position is that that recommendation is not a

7    formal or official or sufficient recommendation absent the

8    weighing of the evidence and the overcoming of the

9    presumption.

10        But that's the purview of the Court.  And my

11   understanding is that pretrial services always leaves those

12   determinations to the Court.  And that their recommendations

13   nonetheless are sufficient for the purposes of that office.

14   They evaluated this case.  They spoke with both of our

15   proposed third party custodians and determined both were

16   suitable.  Determined that the residence, given the steps that

17   Mr. Hall has taken to ensure that no minor children will

18   either reside or visit there were sufficient to make that

19   residence suitable.  And are prepared to set up location

20   monitoring on Thursday of this week.

21        I don't think that the government has articulated a

22   future danger that Ms. Maddox poses.  I think that they are

23   focused very much so on the alleged danger she posed or the

24   conduct she committed in the past.  And that is not the

25   analysis here.  Certainly that goes to the nature and

1    circumstances of the offense and the weight of the evidence.

2    The weight of the evidence is the least weighted factor to be

3    considered.

4         The government has almost entirely ignored the test

5    of whether or not she poses a future danger because there

6    simply is nothing to say to support that.  And while this

7    offense is shocking, while this offense is offensive to our

8    sense of morality, it does not in and of itself warrant the

9    inability for an individual to seek bail and to be released

10   pending trial.

11        I think Ms. Maddox meets the standard here.  I think

12   that there is a combination of conditions that would

13   reasonably assure the safety of the community.  And therefore,

14   I think that the Court must release her under those

15   conditions.

16        We adopt the proposal of pretrial services.  We

17   propose those conditions as well.  And we propose an amendment

18   to one of the conditions that she not travel apart from the

19   approval of pretrial services and in the company of either a

20   third party custodian or other individual over the age of 18.

21   And with that, I would submit.

22        THE COURT:  All right.  And Mr. Gappa.

23        MR. GAPPA:  Just briefly, Your Honor.  I'm aware of

24   the Court's commitments.  Just in response to the suggestion

25   that the government has not addressed the factors that the

44

1   Court needs to consider and that the factors don't support a

2   decision of detention, we disagree.

3          As we noted, as Judge Reinhart noted in the *Hir*

4   decision, even if the defendant puts forward evidence to rebut

5   the presumptions of flight risk and danger, those presumptions

6   do not disappear.  So they remain in place and then the Court

7   needs to look at the four factors.

8          We take a different view.  We would say that at least

9   three out of the four factors weigh in favor of detention.

10  The nature and circumstances of the offense, just because in

11  one case, the *Hir* case, related to terrorism.  Certainly

12  terrorism is a very serious offense, it doesn't mean that

13  other offenses such as this offense are not also serious.  On

14  balance, there's nothing that weighs in the defendant's favor

15  on that ground.

16         The weight of the evidence, we believe, weighs in

17  favor of detention.  With the material that the Court has

18  seen, we believe, because it is sufficient for a jury to find

19  that the government meets its burden of proof beyond a

20  reasonable doubt on all of the elements for any one particular

21  image, that there is sufficient evidence to find the defendant

22  guilty of the charged offenses.

23         We believe also that it shows that there was abusive

24  contact.  It's not simply a matter of taking pictures, but it

25  is actual contact.  So if it were -- and the reference was to

1   chats and fantasy and the reference in a different case to

2   fantasy, in general, people tend to fantasize about what

3   they're interested in.  But these are not simply just chat

4   communications.  And it's also not simply images.  Either one

5   of those you could have a stronger argument for the defendant.

6          In isolation, some of those images, they could argue

7   wouldn't meet the threshold for being a lewd or lascivious

8   exhibition.  But when they're all combined and they're put in

9   context, the defendant has demonstrated her sexual interest in

10  children, which ties to the article that the government

11  submitted for the Court's consideration.  It's not that the

12  government -- certainly I'm not qualified to say if somebody

13  is or isn't a pedophile, which is actually not even the most

14  current designation in the Diagnostic & Statistic Manual.

15         The point is that she's demonstrated she has a sexual

16  interest in children.  And the research indicates that those

17  people who have that don't, without intervention, have that

18  diminish.  That it's an enduring interest on people's part.

19  And she's demonstrated that.

20         So that weighs in favor of detention.  Because it

21  also touches on her danger to any person or to the community

22  in general.  It's not just that she had contact with her own

23  daughter and took pictures of it, but she's also stated that

24  in her word, it's torment to be seeing these girls in

25  their -- in her apartment.

1          And that combined with her demonstrated interest,

2     where she's saying -- she literally says, "I haven't seen her

3     yummy little pussy for a while" and that's what she wants to

4     see.  And she says, "I'd love her to be awake so you can

5     actually get those bottoms off of her and I can see her

6     beautiful pussy."  That's a third victim, in our view.  Or at

7     least a third person that she's demonstrated an interest in.

8     So it's not just one victim or one person.

9          So on balance, when the Court looks at all of those

10    factors, we think it weighs in favor of detention.  And we'd

11    submit that, Your Honor.

12          MS. HOPKINS:  Your Honor, just briefly in response.

13    The government seems to allege that there are three victims.

14    I don't see any support for that in the record or what's been

15    argued so far.  Arguably, there is an alleged victim in Ms.

16    Maddox' daughter and there is an alleged victim in Florida.

17    But no third alleged victim as far as I know.

18          Additionally, I think -- just very briefly.  I think

19    that there -- there's two steps here.  One is determining

20    whether or not Ms. Maddox does pose a danger.  I think that we

21    can safely get there.

22          But the second step is whether or not there's a

23    combination of conditions that would mitigate that danger such

24    that it would reasonably assure the safety of the community.

25    And given that she would be residing in a home where she would

1    be confined, where she has no access to minor children and

2    where she would have extremely restrictive travel.  And the

3    pretrial services office, if the Court deems necessary, could

4    bring each and every request before the Court for individual

5    determination if that was necessary.

6            But I think that combination of conditions, in

7    addition to lack of internet access, and two suitable third

8    party custodians is more than sufficient to reasonably assure

9    that safety.  And that's where the analysis really lies.  We

10   would submit.

11           THE COURT:  All right.  Well, I said at the outset,

12   very close case.  The seriousness of the charges, obviously

13   extremely serious.  That's why these charges carry with them a

14   rebuttable presumption of both flight risk and danger.

15   Predicting future human conduct is a very difficult thing to

16   do.  Maybe even not -- well, I think we could all acknowledge,

17   not completely possible.  It is a prediction of future human

18   conduct.

19           Here, there is a rebuttable presumption that the

20   defendant is both a flight risk and a danger to the community

21   if released.  I believe that, based upon her history and

22   characteristics, as well as the fact that she continues,

23   despite the charges, to have support from her family and

24   others, including two who are willing to become third party

25   custodians, and her complete lack of any significant prior

1    criminal record, I believe rebuts the presumption of both

2    flight risk and danger.

3         The question then becomes can -- are there conditions

4    that can be imposed that would adequately assure that the

5    defendant would not pose a flight risk and danger.  And again,

6    this is very close.  And from reading the transcript, I could

7    tell that Judge McAuliffe was certainly taking her time in

8    trying to reach the appropriate conclusion.  I've maybe

9    considered more, a little bit more of the evidence than she

10   was able to that day.  But it's a close question in my mind.

11        But given what I've seen, given the evidence that

12   I've been presented, given the lack of any evidence, at least

13   so far, indicating any continuing conduct or any molestation

14   with respect to her daughter in the last 20 months or so, 18

15   to 20, since this offense, I think the conditions that

16   pretrial services has proposed do give the Court adequate

17   assurances for the most part.

18        I don't think that we would just be relying upon the

19   defendant's good faith compliance, even if there is something

20   to the notion of, look, Judge, this obviously -- you know, who

21   would put themselves in this position.  She obviously cannot

22   control herself.  I do tend to think that if that were true,

23   we would have seen something over the last 18 to 20 months.

24   There would be more here.

25        But even if that's not true, even if that doesn't

1    really address it.  If I follow the recommendation with two

2    third party custodians, with electronic monitored home

3    incarceration that only allows her to leave the home with the

4    approval of pretrial services and accompanied by an adult

5    approved by pretrial services, and no contact with anyone

6    under the age of 18.

7          With that kind of monitoring and those kind of

8    conditions, I think that does provide us with adequate

9    assurances.  There can't be any guarantees, there never are.

10   Predicting is a difficult thing.  But I -- in my view, those

11   assurances are adequate.

12         So I'm going to grant the motion to revoke the

13   detention order.  I am going to order that the defendant be

14   released on a $50,000 unsecured appearance bond co-signed by

15   both of her third party custodians with the following

16   conditions of release:

17         That she report to and comply with the rules and

18   regulations of the pretrial services agency.  That she's

19   released to the third party custody of Cameron Hall and

20   Jennifer Reeves.

21         That she must reside with the third party custodian

22   Cameron Hall in Madera, California.  Not change her residence

23   without the prior approval of her pretrial services officer.

24         She must cooperate in the collection of a DNA sample.

25         Her travel is restricted to Madera County and to and

1   from Fresno County for court related purposes, unless it is

2   otherwise approved in advance by her pretrial services

3   officer.  She shall not obtain a passport or any other travel

4   document during the pendency of this case.

5            She must not possess or have in her residence or have

6   access to a firearm, ammunition, destructive device or other

7   dangerous weapon.  Additionally, she must provide written

8   proof of divestment of all firearms currently under her

9   control.

10           She must participate in a program of medical or

11   psychiatric treatment, including treatment for mental health

12   as approved by her pretrial services officer.  And must pay

13   all or part of the cost of the counseling service based on her

14   ability to pay as determined by pretrial services.

15           She must report any contact she has with law

16   enforcement to her pretrial services officer within 24 hours

17   of any such contact.

18           She must participate in location monitoring program

19   component and abide by all the requirements of that program

20   which include having a location monitoring unit installed in

21   your residence, a radio frequency transmitter device attached

22   to your person.  She will comply with all instructions for the

23   use and operation of those devices as given to her by the

24   pretrial services agency and employees of the monitoring

25   company.  You must pay all or part of the cost of the program

1   based on your ability to pay as determined by pretrial

2   services.

3          The home incarceration component, you must remain

4   inside your residence at all times except for medical needs or

5   treatment, religious services and court appearances, all

6   pre-approved by your pretrial services officer.  And when you

7   attend any of those -- any of those matters, you must be

8   accompanied by one of your third party custodians or another

9   adult approved in advance by pretrial services unless it is

10  going to be in the presence of your counsel.

11         You must not view or possess child pornography as

12  defined in 18 USC Section 2256(8) except in the presence of

13  your attorney to prepare for your defense.

14         You must not access the internet.  And you must

15  provide proof of the disconnection or termination of any

16  internet services as required by your pretrial services

17  officer.

18         You must not use or possess a computer or any device

19  capable of accessing the internet in your residence or any

20  other location unless otherwise approved by the pretrial

21  services officer.

22         You must not loiter or be found within 100 feet of

23  any schoolyard, park, playground, arcade, movie theater or

24  other place primarily used by children under the age of 18.

25         You must not associate or have any verbal, written,

1  telephonic or electronic communication with any person under

2  the age of 18 except in the presence of another adult who is

3  the parent or legal guardian of that minor.

4        You must not be employed or participate in any

5  volunteer activities in which there's a likelihood of contact

6  with children under the age of 18.

7        Actually, do we even need that condition?  It's a

8  home incarceration.  We're not -- strike that condition.

9  We're not allowing that anyway.  Right?

10        PRETRIAL SERVICES OFFICER:  That's correct, Your

11  Honor.  She's not going to be allowed to leave for work,

12  there's really no need.

13        THE COURT:  So we don't need -- strike 16.

14        And assuming that the unsecured appearance bond is

15  co-signed both by yourself and your third party custodians,

16  your release on bond will be delayed until Thursday,

17  June -- excuse me.  Thursday, July 26th, at 8 a.m., at which

18  time you must immediately report in person to the pretrial

19  services agency to initiate supervision on pretrial services.

20        Ms. Maddox, do you understand each of the conditions

21  that I've imposed on your release?

22        THE DEFENDANT:  I do.

23        THE COURT:  You'll be given a written copy as well as

24  your third party custodians.  Will you abide by each of those

25  conditions and will you make your scheduled court appearances?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  I will advise you that any failure on

3    your part to make your scheduled court appearances will -- is

4    prosecutable as a separate federal felony offense.  And if you

5    were charged with failing to appear, convicted of the failing

6    to appear, the failure to appear itself would be punishable by

7    up to ten years in prison, fine of up to $250,000 or both fine

8    and imprisonment.  And any time imposed for that failure to

9    appear would have to be imposed consecutive to any sentence

10   that you might receive on the already pending charges.

11         Do you understand?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  So it's obviously very important that you

14   stay in touch with your appointed counsel, that you cooperate

15   fully with pretrial services and that you abide in detail with

16   each and every one of the conditions that I've set on your

17   release.  Do you understand and will you do that?

18         THE DEFENDANT:  Yes, Your Honor.  I will.

19         THE COURT:  I will just tell you, I've already said

20   in my view this is a close question.  Very close.  If you're

21   released and there's a violation of any of the conditions of

22   your release, then it becomes not such a close question.

23   You'd have to be returned to custody.

24         Charges are very serious.  Your lawyers, I'm sure,

25   have much that they wish to do.  My only -- the basis for my

1    decision is whether we can adequately protect the community

2    while these charges are pending.  In my view, we can.  But I

3    don't have a crystal ball.  I hope and pray that I get that

4    right.  I certainly do my very best.

5         What happens with the case and what eventually

6    happens in this matter, that's an entirely different subject.

7    These are very serious charges.  But in the meantime, I assure

8    you there's one way you can make this bad situation worse and

9    that's by violating any of these conditions.

10        Anything further?

11        MR. GAPPA:  Your Honor, just a question for

12   clarification.  I heard the Court say release delayed until

13   Thursday the 27th.  But I'm sorry, Thursday -- so is it

14   Thursday or --

15        THE COURT:  I'm sorry, Thursday, that would be three

16   days instead of two.  That's when you said, right?

17        MS. HOPKINS:  Your Honor, it's my understanding that

18   the pretrial services officer will be available to install a

19   monitor on this Thursday, two days from now -- or I'm sorry,

20   three days from now.

21        THE COURT:  I'm sorry.

22        MS. HOPKINS:  At eight a.m.

23        THE COURT:  So strike the -- I said the 26th.  Right?

24   Thursday, the 27th at 8 a.m.   Thank you, Mr. Gappa.  I was

25   for some reason jumping ahead to Tuesday already.

1        MR. GAPPA:  Thank you.

2        THE COURT:  Anything further?

3        MS. HOPKINS:  Nothing further.

4        THE COURT:  Please have the defendant sign a notice

5   to defendant being released as well as the unsecured

6   appearance bond before she's taken from the courtroom.  Make

7   sure the third party custodian that's present signs it.  And

8   then you need the signature of the other third party

9   custodian.  You got that, Mr. Chavez?

10        MR. CHAVEZ:  No.

11        THE COURT:  No.  I mean we need signatures --

12        MR. CHAVEZ:  Oh, yes.

13        THE COURT:   -- by both third party custodians on the

14   unsecured bond before I would sign a release order.

15        MR. CHAVEZ:  Understood, Your Honor.

16        THE COURT:  Thank you.  Court will stand in recess.

17        MR. GAPPA:  Thank you, Your Honor.

18     (The proceedings were concluded at 3:37 p.m.)

19

20        I, KAREN HOOVEN, Official Reporter, do hereby certify

21   that the foregoing transcript as true and correct.

22

23   DATED:  7th of September, 2017     /s/  Karen Hooven____
                                        KAREN HOOVEN, RMR-CRR
24

25