MCGREGOR W. SCOTT
United States Attorney
DAVID GAPPA
Assistant United States Attorney
2500 Tulare Street, Suite 4401 Fresno, CA 93721
Telephone:  (559) 497-4000
Facsimile:  (559) 497-4099

NADIA C. PRINZ
Trial Attorney
U.S. Dept. of Justice, Criminal Division
Child Exploitation and Obscenity Section 1400 New York Avenue NW, Suite 600
Washington, DC 20005 Telephone: (202) 514-3740
Facsimile: (202) 514-1793
E-mail: nadia.prinz @usdoj.gov

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>ASHLEY MADDOX,<br><br>                    Defendant. | CASE NO.  1:17-CR-00167 DAD-BAM<br><br>UNITED STATES' SENTENCING MEMORANDUM |

## I.     INTRODUCTION

The United States of America, by and through its attorneys, MCGREGOR W. SCOTT, United States Attorney for the Eastern District of California, DAVID L. GAPPA Assistant United States Attorney, and NADIA PRINZ, Trial Attorney, files this sentencing memorandum to aid the court in understanding this case and to arrive at the most appropriate sentence.  The government is also submitting several exhibits (Attachments 1 and 2) for review by the court prior to the sentencing hearing.  That material will be made available to defense counsel upon request, and it previously has been available through the discovery process.

1

The government recommends a sentence that includes the following components: 18 years imprisonment followed by a lifetime term of supervised release, a fine, and penalty and special assessments totaling $5100.  The government requests that the court schedule a restitution hearing within ninety days of sentencing in order to permit any victim to submit a claim for restitution.  These recommendations are amply justified by an analysis of the factors set forth in 18 U.S.C. § 3553(a), as well as the relevant United States Sentencing Guidelines (USSG), and they are necessary to provide just punishment and adequate deterrence for the defendant's serious offense conduct.

## II.    CALCULATION OF THE USSG RANGE

The Government agrees with the Probation Office calculation of the sentencing range under the USSG.  (ECF No. 95). The applicable Guideline in this case, for a violation of 18 U.S.C. § 2251(a), is found at USSG § 2G2.1. The base offense level is 32 under § 2G2.1(a).  Because the offense involved a minor who had not attained the age of twelve years, a 4-level increase applies under § 2G2.1(b)(1)(A). Further, the commission of the offense involved a sexual act, for which Maddox is liable (having aided and abetted the act), under § 1B1.3(a)(1)(A).  More specifically, Scott Trader produced images in which he digitally penetrated a minor victim, and he ejaculated in the minor's presence.  Thus, a 2-level increase applies under USSG § 2G2.1(b)(2)(A).  Finally, USSG § 2G2.1(b)(6)(B)(ii) mandates an additional two-level increase, because the defendant and Trader used a computer and an interactive computer service (Kik Messenger) to commit the offense.  So the adjusted offense level is 40.

The government also concurs with the Probation Office assessment that because this offense involved the exploitation of more than one minor, Chapter Three Part D shall be applied as if the exploitation of each victim had been contained in a separate count of conviction.  USSG § 2G2.1(d); PSR at 11.  The factual basis, as stipulated to by the parties, clearly establishes that in the course of aiding and abetting the production of child pornography (depicting Minor Victim 1), Maddox created and sent Trader images of Minor Victim 2, including pictures which exposed and/or focused on the genital region of Minor Victim 2.  Because the defendant has admitted that she produced these images of

Minor Victim 2, the parties' only disagreement is whether these images of Minor Victim 2 constitute child pornography.  The answer is yes.

Maddox created images of child pornography, in part, because the focal point of several images is the minor victim's genital area, and Maddox created those images to elicit a sexual response in Scott Trader and herself.  *See U.S. v. Overton*, 573 F.3d 679, 686 (2009) (*citing United States v. Dost*, 636 F.Supp. 828, 832 (S.D.Cal.1986), aff'd sub nom. *United States v. Wiegand*, 812 F.2d 1239 (9th Cir.1987)).  Maddox created these images for the specific purpose of sending them to Trader.  She intended to appeal to Trader's sexual interests, which were explicitly clear to her.  Put another way, the images are "so presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur." *United States v. Hill*, 459 F.3d 966, 972 (9th Cir. 2006)  (*citing Wiegand*, 812 F.2d at 1244) (holding affidavit submitted in support of search warrant established probable cause to believe that images on defendant's computer were, as described, lascivious).  Maddox's intent to create images that would be sexually exciting to Trader is also evident from the similarities between the images that Trader produced and the ones that Maddox, herself, produced.  The two offenders sent each other images of the minor victims, showing the victims asleep, wearing colorful pajamas, and with a focus on the pubic area. Though Maddox's fondling might not rise to the level of Trader's digital penetration, the parallel is clear: Maddox attempted to produce the kind of material she knew that Trader was interested in.  Thus, the images Maddox produced of Minor Victim 2 constitute child pornography and both Minor Victim 1 and Minor Victim 2 are victims of the offense conduct and the multiple victim instruction applies under USSG § 2G2.1(d).

A four-level increase in offense level also applies because Minor Victim 2 was less than 12 years old.  And under USSG § 2G2.1(b)(3), if a defendant knowingly engaged in distribution of child pornography, the offense level is increased two levels.  Using the KIK Messenger, the defendant distributed child pornographic images of Minor Victim 2 to Scott Trader.  The defendant cannot contest

that she created and transmitted the material, because it was all recovered from devices seized when a search warrant was executed at Trader's residence in Florida and she is depicted in much of the material. So there is a two-level increase in the offense level. Finally, because the minor was in her care, another two-level increase applies under §2G2.1(b)(5). The adjusted offense level for this second count is therefore 40. Two counts with an offense level of 40 results in an increase of 2 additional levels, under Chapter Three. Thus, the defendant's final total offense level is 42. Maddox's adjusted offense level, taking into account a 3-level reduction for acceptance of responsibility, is 39. With a criminal history category of I, Maddox's USSG range for imprisonment is 262-327 months.

Although they are only advisory, the USSG, at 5K2.0 Application Note 4, indicate that downward departures in "child crimes and sexual offenses," including the offense for which the defendant will be sentenced, are strongly discouraged. Neither a departure nor a variance is warranted in this case. First, Maddox has already received what is tantamount to a departure in that the plea agreement has limited the maximum prison sentence for which the government will argue to 216 months, which is well below the minimum guideline sentence of 262 months. There is nothing in the record to suggest that Maddox's depression or even an untreated dependent personality disorder caused her mental capacity to be diminished. Nor was her conduct "aberrant behavior" that would support a departure under § 5K2.20. Significantly, the defendant engaged in the offense conduct over a period of six months. Moreover, the defendant stated during her evaluation by Dr. Geisler that she also "sexted" with another man, from whom she also obtained child pornography. Dr. Geisler's Report at 16. She acknowledged sending this other man the same pictures she sent to Trader and indicated that their relationship lasted about six months, with some overlap with the time she spent online with Trader. *Id.* at 17. For these reasons, the government agrees with the USSG calculation and the sentencing recommendations in the PSR.

### III.     THE § 3553(a) FACTORS

Under 18 U.S.C. § 3553(a), when imposing a sentence, the court should consider: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to promote the goals of sentencing; (4) the kinds of sentences available; (5) the sentencing guideline range; (6) any pertinent policy statement issued by the Sentencing Commission; (7) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (8) the need to provide restitution to any victims of the offense.

### A.     Nature and Circumstances of the Offense

The defendant initially came to the attention of law enforcement agents in Fort Pierce, Florida when an investigation by Homeland Security Investigations (HSI) agents into an offender there revealed that Maddox had produced and exchanged child pornography images with that offender.   Specifically, on June 5, 2017, HSI Fort Pierce contacted HSI Fresno and informed them they had executed a child exploitation search warrant on June 1, 2017, in Port St. Lucie, Florida, for the home of Scott Joseph Trader.  Trader was initially investigated for the enticement of a minor with whom he had corresponded online.  In the course of that investigation, HSI agents learned that Trader was also abusing two minors in his care, one of which was Minor Victim 1.  Under the authority of a federal search warrant, HSI Fort Pierce agents seized several electronic devices from Trader's residence.

 HSI Special Agent Brian Ray, when reviewing the seized devices, found files containing child pornography and screen shots of sexually graphic text messages from an individual who identified herself as Ashley Maddox. Agents conducted open source research which led to the identification of the defendant, Ashley Maddox, who was living in the Fresno area.   The investigation into Maddox revealed that she had produced these images and videos, which depicted a then seven-year-old minor, Minor Victim 2, in her care. These images included lascivious depictions of the minor's genitals. Several of these images are included in Attachments 1 and 2 for the court's consideration. These images were

recovered from Trader's computer in a folder entitled "Ashley, [Minor Victim 2], [Minor 3]." The folder contained many images of Maddox herself, including "selfies", family photos, as well as many photos of Maddox engaging in sexually explicit conduct. It also contained many non-explicit, clothed images of three children in Maddox's care.

Significantly, this folder also contained 17 nude and/or sexually explicit images and videos of Minor Victim 2, including the images described below.[1]  The naming conventions for these files are consistent with the Kik messaging program.  These images of Minor Victim 2 are lascivious depictions of the genital area. For example, one image file (1B), 9983413b-f577-4649-b32a-cb5e93ced5b4.jpg, depicts Minor Victim 2 standing in a bedroom in Maddox's residence.  Minor Victim 2 is standing fully nude, with her arms folded back, and her genitals exposed.  The picture is cropped so that nothing above her chest, including her head, appears in the frame, rendering her exposed genitals as the focal point of the picture.  Image file (1C) a93dd870-1bf6-4319-854c-89f0a44d6190.jpg is taken in the bathroom, and shot from a side angle so that it depicts only the nude, lower body of Minor Victim 2, with her genitals partially visible.  Image file (1D) bc16dd0f-18c2-4180-997b-c821309e3e25.jpg depicts the minor, nude, standing in a bedroom. The minor's face is partially visible as she is looking down and her arms are out gesturing. This image appears to have been taken surreptitiously, as the minor's gaze is not directed at the camera, and Maddox's thigh appears in the left side of the image.

As another example, in video file 37c4a768-ae91-40c9-aa0e-22e92c5c4ce5.mp4 the camera is focused to display only the pubic area of Minor Victim 2, who appears to be lying in bed, perhaps asleep. She appears to be wearing shorts or pajama bottoms[2], and an adult hand is shown with the index

---

[1] Selected still images (which have been printed) are included in Attachment 1 while video files are all on one disc that is submitted as Attachment 2.

[2] The fact that the minor was wearing pajama bottoms does not preclude a finding of lasciviousness. *See United States v. Knox*, 32 F.3d 733 (3rd Cir. 1994); *United States v. Price*, 775 F.3d 828, 837 (7th Cir. 2014) ("There is no nudity requirement in the statutory definition of "sexually explicit conduct," of which "lascivious exhibition of the genitals or pubic area" is a part."). *See also United States v. Horn*, 187 F.3d 781, 790 (8th Cir. 1999) (where minors were wearing swimsuit bottoms, a reasonable jury could conclude that the exhibition of the pubic area was lascivious despite this minimal clothing because of the way in which the pictures were

finger extended, moving back and forth over the child's pubic area. The defense has posited that it "is

unclear whether the hand physically touches the child." Defendant's Informal Objections, ECF No. 95-

1, at 3.  To the contrary, it is clear in the video that the finger disturbs clothing which is partially

covering the child's pubic area.   The contact is clearly visible.  Regardless, a lack of contact would not

change the fact that the image depicts sexually explicit conduct. The focus on the genital area and the

stroking finger are clearly meant to draw focus on the child's sexual parts and at least to suggest, if not

actually depict, fondling and/or masturbation.  Moreover, the definitions under § 2256 provide that

sexually explicit conduct means "actual or simulated…masturbation. 18 U.S.C. § 2256(2).[3]  In *United*

*States. v. Banks*, 556 F.3d 967, 980 (9th Cir. 2009), the Ninth Circuit held that the district court did not

err in concluding a video depicted sexually explicit conduct. *Id.*  The district court found that a video

contained a lascivious exhibition of the genitals of the minor child because it depicted the masturbation

of the child "for the purpose of eliciting in the viewer a sexual response." *Id* at 971.

Another such video produced by the defendant, 0e88ad41-ab3c-4c17-957c-2feeba375e0a.mp4,

is shot with a close camera angle on Minor Victim 2, focusing on her genital region, with her pajama

shorts pushed aside to reveal her underwear.  A photo (1E), 400712ee-21d6-4347-a878-

1678a4a02a28.jpg, is similarly cropped to display only her pubic region and exposed underwear. From

the similarity of content and clothing, these two images appear to have been taken on the same occasion.

Aside from the images and videos described above, the "Ashley, [Minor Victim 2], [Minor 3]"

folder also contained three screenshot captures of chat conversations with "Ash M." These screenshots,

submitted as Attachments 1F, 1G, and 1H, are dated November 5, 2015, and are consistent with the way

Kik chat messages appear on a user's phone. These messages give significant context to the images in

the folder. In one such screen shot (1F), Ash M wrote "So [Minor Victim 2] is 7…Can you imagine the

_____

framed).

[3] The defense has argued, in an informal objection to para. 9 of the PSR, that the district court determined that there was not evidence of "molestation" in the video.  The government does not interpret the record in the same way, because it does not appear that the court made an explicit finding on that issue.

7

torment I go through with these two tiny, amazing pussies in my house!? Would you really come here on your vacation babe?"

In another saved screenshot (1F), Ash M says "I would love for you to come here [smile emoji] to be completely honest I've actually been a lot more attracted to [Minor Victim 2] recently. I want to lick your little ones pussy so bad but I love all that's happening with her right now [ smile emoji]  You can definitely add me! It's Ashley Maddox in Fresno, CA. Or you can find it by my email (which I don't know the password for so don't actually email it lol) amaddox1987@gmail.com."  The fact that Trader saved these messages along with the photos of Maddox and the minors shows not only the content of their communications, it is also compelling circumstantial evidence of the reasons for which he acquired -and she created and transmitted -these images, namely to encourage and communicate with one another regarding their mutual sexual interest in children.

Based on such context, as well as the images themselves, it is clear that Maddox intended to produce images of Minor Victim 2 that would appeal to Trader's prurient interest in minors. This is significant because a trier of fact can look to the six factors enumerated in *United States v. Dost*, 636 F.Supp. 828, 832 (S.D.Cal.1986) to determine whether a visual depiction of a minor constitutes a lascivious exhibition of the genitals or pubic area in the particular case.  These factors, which are not an exhaustive list, include the following: 1) whether the focal point of the visual depiction is on the child's genitalia or pubic area; 2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity; 3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child; 4) whether the child is fully or partially clothed, or nude; 5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;  6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer. *U.S. v. Overton*, 573 F.3d 679, 686 (2009) (*citing United States v. Dost*, 636 F.Supp. 828, 832 (S.D.Cal.1986), aff'd sub nom. *United States v. Wiegand*, 812 F.2d 1239 (9th Cir.1987)).

Thus, in considering whether an image constitutes a lascivious exhibition, courts have looked to the intent of the producer or editor of an image. The *Overton* court went on to marshal cases to support its argument that the sixth *Dost* factor is especially at issue in production cases:

> Although it is tempting to judge the actual effect of the photographs on the viewer, we must focus instead on the intended effect on the viewer." *United States v. Villard*, 885 F.2d 117, 125 (3d Cir.1989). As we have held, "lasciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or likeminded pedophiles." *Wiegand*, 812 F.2d at 1244; *accord United States v. Wolf*, 890 F.2d 241, 245 (10th Cir.1989) ("[T]he Ninth[C]ircuit clearly stated that to violate *689 18 U.S.C. §2251 the photographer need not portray the victimized child as a temptress.").

*Overton* at 688-89.  "Each of the pictures featured the child photographed as a sexual object.... [T]hat is, so presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur." *United States v. Wiegand*, 812 F.2d 1239, 1244 (9th Cir.) (emphasis added), cert. denied, 484 U.S. 856, 108S.Ct. 164, 98 L.Ed.2d 118 (1987).  *See also United States v. Horn*, 187 F.3d 781, 790 (8th Cir.1999) (holding that "[b]y focusing the viewer's attention on the pubic area, freeze-framing concrete an image intended to elicit a sexual response in the viewer. The 'lascivious exhibition' is not the work of the child, whose innocence is not in question, but of the producer or editor of the video."); *United States v. Johnson*, 639 F.3d 433, 440–41 (8th Cir. 2011) (holding that a reasonable jury could find that videos of minors weighing themselves in an examination room constitute lascivious exhibitions based on how the video was recorded, how the zoom feature was adjusted, and the producer's intent to elicit a sexual response in the viewer, even though the victims did not act in a sexual manner).

In the course of his examination of Trader's seized media, Special Agent Ray discovered additional chat communications between Maddox and Trader that had been exchanged through the Kik application.  The references and names within the chat content itself, including the images exchanged, make it clear that these were chats between Maddox and Trader.  The recovered messages included an exchange beginning November 24, 2015, and ending December 30, 2015.  There were additional communications beginning on January 5, 2016, and ending on April 28, 2016. Messages exchanged as

early as November 24, 2015, indicate that they had already been communicating prior to that date and that Trader had previously shared videos of Minor Victim 1 with Maddox. The court might recall that the defense represented that Maddox had voluntarily disassociated from Trader in 2015 and reformed her life. More specifically the defense represented to this court when convincing it to revoke a magistrate judge's detention order: "there is absolutely no evidence that since December of 2015, she's engaged in any illegal conduct, that she departed from that alleged conduct of her own volition, and that she has changed the structure of her lifestyle and who she associates with dramatically since that time."[4] But the messages in 2016 contradict that earlier position and reveal that it was Maddox who reinitiated communication with Trader. The defense's prior representations should also undermine any confidence that could be placed in arguments put forward in this sentencing proceeding.

The chat was sexual in nature and throughout the chat the two participants talked about the sexual abuse of the minors in their respective care. Specifically, Maddox requested that Trader perform and record specific sexual acts involving the nine-year-old (Minor Victim 1). In addition to participating in these sexually graphic chat messages, Maddox also sent Trader a photo and a video of herself engaged in masturbation, apparently to show her excitement regarding their conversation. In the course of these chats, Trader also sent Maddox 22 images and videos, the majority of which depict Minor Victim 1 engaged in sexually explicit conduct, including both lascivious depictions of the minor's genitals as well as images of Trader sexually abusing the minor. A few examples are submitted in conjunction with this sentencing memorandum. These files include still image 1I and videos where Trader focuses the camera on the apparently sleeping minor's pubic area, capturing her colorful pajama shorts. He used his hand to push aside the minor's shorts and underwear and digitally penetrate the minor. One video file, entitled Attachment32742ef3-6cf1-435e-95f7-dc52f30501b9.mp4, appears to be a preexisting video of child pornography that Trader sent to Maddox.

---

[4] ECF No. 33 (Transcript of Hearing on July 24, 2017, at 8, lines 3-10).

Maddox responded positively to the videos from Trader and specifically requested that he produce more for her. There is an obvious, and disturbing, parallel in the type of material that Maddox created of Minor Victim 2 which was then sent to Trader.  The following are examples of how, over the course of several months, Maddox encouraged and facilitated the continued abuse of this minor by Trader in her chat communications with him:

11/27/15:      [Trader sends Maddox sexually explicit images of the minor]

           Maddox: "Oh baby!!! I wish I would have been home!! I miss her sweet little pussy"

12/2/15:      Maddox: "Mmmm thank you baby!! My pussy is throbbing. I wish I wasn't at work. I want to get off to her beautiful pussy"

12/2/15:      [at the promise of more videos later that evening specifically for her]

           Maddox: "You're so sweet to me :) I can't wait for tonight. Aaaaaahhhhhh"

1/5/16: Maddox: "I love when you had [minor victim] suck your cock"

           Trader: "…I want to have her do it again for u"

           Maddox: " Yes baby!!! Please! … [Trader says it will have to be after the next two days]…Well, just let me know when you have the ability to…I'm usually pretty free in the evenings"

1/5/16:

           Maddox: "Babe I would die to see you licking her clit"

           Maddox: "And you can do that while she's awake and there's light! lol…God babe…I would die"

           Trader: "U can't die lol, then who would I share all this with :p…"

1/5/16: (After Trader promises her another video, made specifically for her, and describes it in explicit detail as involving oral sex on Minor Victim 1)

           Maddox: "Oh fuck!!! That gets me soo damn wet babe…I want to see it so bad"

1/20/16:

    Maddox: "She looks so yummy…did I hear her moan in that last video??"

1/20/16:    (Trader describing rubbing his daughter's vagina)

    Maddox: "Wow nice! Lol…You're getting closer and.  Closer [sic]"

1/20/16:    (Trader says he plans to have sex with this daughter)

    Maddox: "I need to see that…I don't care if I'm not watching cp or whatever lol"

4/22/16:    (Trader tells her there will be 7 girls at his house for a sleepover and plans to sexually abuse/exploit them)

    Maddox: "Omg! Are you going to message me when you do?!"

    Maddox: "Mmmmm that made my pussy wet" (sends a video of herself masturbating), then says "I'm so jealous of you with all those girls there"

    Through her online communication with Trader, Maddox validated, encouraged, and supported the abuse against Trader's victim. This was not a one-time chat session where the topic of sexual abuse against a child was fleetingly discussed. Maddox continued to return to her online communication with Trader knowing that her conversation with him would inevitability return back to a discussion of sexual abuse.  Each time Maddox re-engaged in that online communication, she inherently conveyed her acceptance of that deviant behavior, and her positive responses encouraged that abuse to continue. Maddox also offered Trader more than just sexually encouraging responses, but also confirmed that she actually viewed the videos by commenting on the content. Maddox provided Trader an audience with which to send his produced material, and thereby facilitated the continued sexual exploitation of that child.  In this regard, Maddox is also culpable for the sexual abuse of Trader's daughter, despite the fact that Maddox was not the hands-on abuser.

    One of the most important aspects of Maddox's online communication with Trader is when Maddox appears to assume a more dominant and deliberate role in the abusive discussions. Extending

beyond her encouragement of Trader to engage in abusive behavior, Maddox at times was more directed in her responses and requests, and even demonstrated purposeful acts to facilitate the abuse of young girls, including Minor Victim 2, who was in her own care. Although there is no indication that Maddox ever met Trader in person, her chats contain evidence of how her online relationship influenced her behavior significantly over time. For instance, on December 2, 2015, Maddox wrote in reference to Minor Victim 1, "I want her to be awake too :) I would love her to be awake so you can actually get those bottoms off her and I can see her beautiful pussy."  This chat message is an example of Maddox making a specific request of Trader for produced content of Minor Victim 1. With this statement, Maddox not only encouraged the abuse, she directed Trader to engage in sexual exploitation based on the particular fantasy she wanted to see realized.

On January 6, 2016, Maddox wrote him "I bought [ Minor Victim 2] a nightgown today…she's wearing [it] now but  she's still awake so I'm not even gonna go there lol…small steps  lol…just knowing the real reason I bought it." Here, Maddox explicitly stated that she went out and purchased an item (a nightgown) intended to be used in the commission of her sexual abuse of Minor Victim 2. This noted transition from online chatting about abusing Minor Victim 2 to offline actions demonstrates an escalation in Maddox's behavior.  As Maddox herself noted, "small steps" were being taken toward more egregious abuse.

The chats also make it apparent that Maddox enjoyed these communications and intended to continue them.  As noted, she previously represented to this court that she voluntarily and permanently broke off communications with Trader by late 2015.  But on April 24, 2016, she sent Trader the following chat:  "It's the weekend and you're not messaging me." In this chat message, Maddox actually initiated the conversation in an effort to follow up on Trader's promises of chatting with her and sending her material of a slumber party involving seven minor females. This signifies overt and purposeful actions by Maddox to engage in conversations related to the sexual abuse of children and the request for

images depicting abusive content. The defendant's own words are the best evidence that she could not resist engaging in a continuing course of conduct of chatting, encouraging, and exchanging images with Trader. The fact that two minors, and potentially more, were harmed by her conduct did not deter her from chatting with him.

In fashioning the sentence, the court should also consider how the offense impacts the victims of this offense. Both minors are victims of Maddox's offense conduct. By alerting authorities or by expressing shock or disinterest, Maddox could possibly have prevented further abuse of a nine- year-old minor.  Instead, Maddox deliberately and persuasively encouraged the continued sexual abuse of the minor in Trader's care.  Maddox, as a parent, should have tried to protect Minor Victim 1 from such abuse by Trader once she became aware of it, rather than contribute to continued victimization.  And clearly Maddox also victimized Minor Victim 2 in that she produced images of that minor herself and shared them with Trader.

The court should consider the impact of Maddox's actions on her victims.  The "use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child" used in the production of such material.  *Osborne v. Ohio*, 495 U.S. 103, 109 (1990); *see also New York v. Ferber*, 458 U.S. 747, 758 n. 9 (1982) ("it has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults"); Shanta R. Dube et al., *Long-Term Consequences of Childhood Sexual Abuse by Gender of Victim*, 28(5 ) Am J Prev Med, 430, 430 (2005) ("studies examining the long-term effects of childhood abuse and related stressors have found increased risk for outcomes such as substance use and misuse, psychiatric disorders, suicide, and numerous other health and social problems").  The long-term effects of such abuse bear upon the need for just punishment.

Intrafamilial abuse is no less traumatic than extrafamilial abuse, and some studies have even suggested that intrafamilialabuse is more traumatic. See C. Thresa Yancey & David J. Hansen,

*Relationship of Personal, Familial, and Abuse-Specific Factors with Outcome Following Childhood Sexual Abuse*, Aggression and Violent Behavior, 15:6, 410–21 (2010) ("Results regarding the impact of victim–perpetrator relationship are quite divergent, with some reporting that extrafamilial abuse is more damaging, some reporting that intrafamilial abuse is more damaging, and others finding no difference based on relationship between the victim and perpetrator."); Teresa Magalhães et al., *Sexual Abuse of Children: A Comparative Study of Intra and Extra-Familial Cases,* 16 J. of Forensic and Legal Med. 455 (2009) ("The existing data suggest that individuals experiencing intra-familial abuse are affected more significantly than those experiencing extra-familial abuse."); Barbara A. Lucenko et al., *Relationship to Perpetrator and Posttraumatic Symptomatology Among Sexual Abuse Survivors*, Journal of Family Violence 15, 169–79 (2000) ("No significant differences were found in traumatic symptomatology between those whose perpetrators were family members and those whose perpetrators were not or between those abused by someone in the home and those abused by someone outside the household."); Belinda Plattner et al., *Pathways to Dissociation: Intrafamilial Versus Extrafamilial Trauma in Juvenile Delinquents*, J. Nerv. Ment. Dis. 191, 781–788 (2003) (Those experiencing intrafamilial abuse are more likely to dissociate); Donald G. Fischer & Wendy L. McDonald*, Characteristics of Intrafamilial and Extrafamilial Child Sexual Abuse*, 22 Child Abuse & Neglect 915 (1998) (Intrafamilial abuse is correlated with earlier onset, longer duration, higher level of intrusion, and greater physical and emotional injury). The impact of the defendant's conduct on both victims is therefore undoubtedly significant.  Thus, a sentence of 18 years imprisonment would adequately reflect the nature of the defendant's serious crime.

### B.   History and Characteristics

The defendant has no criminal history; nevertheless, other characteristics of the defendant weigh in favor of a significant sentence.  The defendant's behavior, in victimizing two innocent children shows a disturbing lack of empathy in a parent or caregiver.  Other characteristics of the defendant should also

be of concern for the court. While minimizing her own conduct, Maddox has admitted to her inability to resist providing a partner with what he is seeking, even if it involves conduct that is both depraved and harmful to others. In her statement for the PSR, Maddox indicated:

> When [Trader] came back and told me what he wanted, to role play some of his fantasies, I thought that was an easy thing to do if it was what he needed in order to keep loving me. He kept wanting more and more and eventually it wasn't really role playing. I knew he was sending me things that were real, but it still didn't feel real. I could draw a clear line for what I was not willing to do to [Minor Victim 2] because I would never do anything to hurt her, but I didn't know how to draw that same line between Scott and I and the things he was sending to me. I also think that role playing made it easier to just say the words even though I didn't really mean them. It was more about giving Scott what he wanted, and I felt like I mattered to him because I was able to do that. Looking back I am disgusted with what I wrote and how far it went."

PSR at 8. Maddox claims she was unwilling to go as far in the sexual abuse of Minor Victim 2. That distinction in and of itself shows that she understood the level of depravity of the abuse to which Trader subjected Minor Victim 1. Moreover, statements which depict her conduct as mere "role playing" do not ring true in light of the content of her communications with Trader. For instance, messages such as the one from December 6, "I bought [Minor Victim 2] a nightgown today…she's wearing [it] now but she's still awake so I'm not even gonna go there lol…small steps  lol…just knowing the real reason I bought it…"  show that she was equally willing to participate in the sexualization of Minor Victim 2, even without direct prompting from Trader. The fact that she engaged in similar communications with another man, as she admitted in her evaluation by Dr. Geisler, is further proof that Maddox was unable to resist the impulse to engage in such behavior on more than one occasion.

The defendant also points to her own history of abuse as mitigation for her offense conduct. However, as a victim herself, she better than most could understand the traumatic impact that such abuse would have on the Minor Victim 1 and Minor Victim 2. Despite that knowledge, she was unable to conform her conduct to the law or to act to protect innocent children, including a minor in her own care. In these ways, the defendant's history and characteristics support the government's request for an 18-year term of imprisonment.

### C.      Need to Deter Future Criminal Conduct and to Protect the Public

The defendant's sentence should both deter her (and others) from engaging in future criminal conduct and also protect the public.  If given the opportunity, there is a strong likelihood that the defendant will engage in similar behaviors in the future, due not only to her sexual attraction to children but, just as significantly, her demonstrated willingness to give in to such deviant impulses in order to sustain a romantic relationship or to gain the attention and admiration of her partner(s).

Simply put, the instant offense conduct is the best evidence that the defendant is sexually attracted to children.  *See* James M. Cantor and Michael C. Seto, *Child Pornography Offenses Are a Valid Diagnostic Indicator of Pedophilia*, J Abnorm. Psychol., 115(3):610-5 (2006) ("Child pornography offending is a valid diagnostic indicator of pedophilia.  Child pornography offenders were significantly more likely to show a pedophilic pattern of sexual arousal during phallometric testing than were comparison groups of offenders against adults or general sexology patients.  In fact, child pornography offenders, regardless of whether they had a history of sexual offenses against child victims, were more likely to show a pedophilic pattern of sexual arousal than were a combined group of offenders against children"); *see also* U.S.S.C., "*2012 Report to Congress: Federal Child Pornography Offenses,*" ["Report"] Chapter 4, p. 77.  According to the Report, "Sexual interest in children and corresponding sexual gratification are significant motivators for most child pornography offenders.  Offenders often use the images to masturbate and to validate their sexual interest in children."  *Id.*

Even if the court were to credit the defendant's assertions that she has no such sexual interest in children, and engaged in this behavior only for the purposes of receiving love and attention from deviant men, there is no less cause for concern that she could or would offend again. The defendant has encountered in her online activities more than one such partner and engaged in these sorts of communications over the course of several months.  Her past behavior therefore speaks to her

dangerousness in that her own scruples, both as a mother and as an otherwise apparently law-abiding citizen, did not prevent her from engaging in conduct which she knew to be harmful to real minors.

Thus, in imposing a sentence for aiding and abetting the production of child pornography, the court should aim to send a message of deterrence, both to Maddox, with regard to her potential future conduct, and to other offenders generally.  It is thus reasonable to conclude that if given the opportunity, there is a strong likelihood that the defendant will recidivate, due to her sexual attraction to minors and her inability to resist her own impulses. According to *A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, Ryan C. W. Hall, M.D. and Richard C.W. Hall, M.D., P.A., Mayo Clin. Proc. 467 (April 2007), "The published rates of recidivism are in the range of 10% to 50% for pedophiles depending on their grouping." *See also* H.R. Rep. No. 107–527 at 2 (2002) ("Studies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes").  An appropriately lengthy sentence is necessary to deter the defendant from repeating this criminal behavior, and to protect children from her actions.

Congress, in the PROTECT Act, provided for a lifetime term of supervised release for the offense for which the defendant will be sentenced.  The concern was that sex offenders, such as the defendant, who have manifested a sexual interest in minors have restrictions placed on their access to minors, computers, the internet, etc. in order to minimize the risk that they will reoffend.  The defendant has demonstrated her sexual interest in minors, particularly minor females, and in order to minimize the risks to society that she will reoffend, she should always be subject to supervision.  Because supervised release allows the court to fashion appropriate conditions to monitor the defendant's conduct and provide her with beneficial treatment, it is the most useful way to address the defendant's risk of reoffending post-incarceration.

Indeed, even for the relatively less serious offense of possession of child pornography, the Sentencing Commission and Ninth Circuit have noted the presumptive reasonableness of a lifetime term

of supervision.  *See USSG § 5D1.2(b)(Policy Statement)* ("If the instant offense of conviction is a sex offense, however, the statutory maximum term of supervised release is recommended."); *United States v. Cope*, 506 F.3d 908 (9th Cir. 2007).  The Ninth Circuit also noted that other circuit courts of appeal have held that lifetime terms of supervised release are reasonable for those convicted of possession of child pornography.  *See Hayes*, 445 F.3d at 537 (2d Cir. 2006); *United States v. Gonzalez*, 445 F.3d 815, 820 (5th Cir. 2006) (lifetime term for possession of child pornography was reasonable); *see also United States v. Moriarty*, 429 F.3d 1012, 1025 (11th Cir. 2005) (lifetime term did not violate Eighth Amendment).   The longer the term of supervision, the lower the risk of reoffending that the defendant will present to the public, since part of the supervision process will include registration as a sex offender, restrictions on access to minors, computers, and the internet.

### D.     Need to Provide Treatment to Defendant

Due to the nature of the defendant's crimes, the defendant should be ordered to undergo a sex offense-specific evaluation and participate in a sex offender treatment or mental health treatment program approved by the probation office.  Due to the nature of the defendant's crimes, she also should be ordered to participate in a sex offender treatment program while incarcerated to increase the chance that she might learn to control her behavior.

### E.     Need to Avoid Unwarranted Sentencing Disparities

The nature and impact of the defendant's crime and her history and characteristics, as well as the need for deterrence and to protect the public, all support a term of imprisonment of 18 years.  As such, the need to avoid unwarranted sentence disparities weighs in favor of this sentence. That the defendant is female does not warrant any disparity of sentence between this defendant and others engaged in similar conduct. Rather, it is her status as a care-giver that speaks to the depravity of her conduct and her sentence should be commensurate with that.

As a female sex offender, Maddox may appear differently situated to the court than most offenders sentenced for the same offense.   However, the incidence of females committing sex offenses is underreported, poorly understood, and often overlooked by societal systems, sectors and professionals. As a result, the scope and implications of female sexual offending have been repeatedly underestimated.  *See* Marie H. Colson et al., *Female Sex Offenders: A Challenge to Certain Paradigmes. Meta-Analysis*, 22 Sexoligies 109 (Oct. 1, 2013), https://www.researchgate.net/publication/259144622_Female_sex_offenders_A_challenge_to_certain_paradigmes_Meta-analysis ("[I]t is still difficult to make any reasonable estimate of how many, or what percentage [of women commit sex crimes].  Some experts think that approximately 4% of sex offenders are women . . . but studies of victims show us that this figure is grossly under-estimated.  Some studies focusing on the male population of junior high and high schools reveal that between 43 and 60% of the perpetrators of sex abuse are women.") (citation omitted).  Colson's article goes on to cite studies which indicate that "the fact that female sex crime has been shrouded in silence for so long has concealed its grave consequences and implications and yet the survivors of female sexual abuse have reported that sexual abuse by women was more harmful and detrimental than any sexual abuse they had experienced from men." *Id*. at 110 (internal citations omitted). For these reasons, an appropriate sentence should reflect the severity of the defendant's conduct with regard to other production offenders, male or female, who engaged in similar conduct.

The court should also note that even though he pleaded guilty and accepted responsibility for his conduct, Scott Trader received a life term of imprisonment.  He was approximately age 32 when the court imposed that sentence.  Maddox was partially responsible for the conduct that resulted in that sentence, and it is appropriate for this court to consider, when deciding at what age Maddox should be released from custody, that Trader will likely never be released from prison.

### F.     Restitution

The United States requests that any restitution determination and hearing be deferred as allowed by 18 U.S.C. § 3664(d)(5).  It should be noted that as part of her plea agreement, the defendant agreed to pay restitution in the full amount of the losses to any party whom the court deems a victim.   The U.S. Attorney's Office will provide copies of any restitution request(s) and associated documentation to the court and defense counsel.  The government has communicated with a representative of a victim who should be entitled to submit a claim for restitution, and the government will provide its recommendations on restitution amounts in advance of any future hearing.

### IV.    INDIGENCE AND ABILITY TO PAY A FINE / JVTA

Maddox is non-indigent because she has the ability to earn money in the future to pay the $5,000 special assessment under the Justice for Victims of Trafficking Act (JVTA).  Under the JVTA, a court must impose a $5,000 special assessment for any "non-indigent person" convicted of receipt of child pornography.  18 U.S.C. § 3014(a).  Section 3014 is silent on how courts should determine if a defendant is "non-indigent," but every circuit to address this issue has held that courts do not need to look only at a defendant's assets at the time of sentencing, but rather they may consider future earnings potential.[5]

Maddox suggests that she cannot be considered "non-indigent" because she qualified for court-appointed counsel.  But the circuits that have considered this issue have rejected the same argument. *See, e.g.*, *United States v. Kelley*, 861 F.3d 790, 801 (8th Cir. 2017). In *Kelley*, the Eighth Circuit rejected the defendant's argument that the standard for indigence under the JVTA is the same as the standard of indigence for appointment of counsel or proceeding in forma pauperis.  *Id.* at 800–01.  The court noted that the standard for in forma pauperis is—and should be—lower than for indigence in post-

---

[5] *United States v. Lail*, 736 Fed. Appx. 381, 382 (4th Cir. 2018) (per curiam); *United States v. Graves*, 908 F.3d 137, 138 (5th Cir. 2018); *United States v. Shepherd*, 922 F.3d 753, 757 (6th Cir. 2019); *Kelley*, 861 F.3d at 801; *United States v. Janatsch*, 722 Fed. Appx. 806, 811 (10th Cir. 2018).

judgment fines, because if a defendant cannot afford an attorney he cannot be assured a fair trial.  *Id.*
But for post-judgment fines, like the $5,000 JVTA special assessment, the court found more apt the
comparison of sentencing phase standards for indigence, which allow a court to consider a defendant's
future earning ability.  *Id.* at 801.  In the USSG, for instance, a defendant bears the burden to prove that
he cannot afford to pay a fine at the time of sentencing and that he is "not likely to become able to pay a
fine upon his release from his term of imprisonment."  *Id.*  Likewise, under the Victim and Witness
Protection Act courts may consider a defendant's future earning ability in deciding how much restitution
to order.  *Id.*  The reason courts look not only to a defendant's current assets, but also her future earning
potential when imposing a fine is because the defendant will have a chance in the future to pay the fine
once she is released from prison, so limiting the inquiry to the assets she has at the time of sentencing
does not make sense.  *United States v. Shepherd*, 922 F.3d 753, 758 (6th Cir. 2019).

  While the Ninth Circuit has not yet squarely addressed the issue, it signaled that it would also
consider future earning potential in deciding whether a defendant is "non-indigent."  In *United States v.
Strange*, the Ninth Circuit held that the district court properly took into account that the defendant was
"able bodied" because the defendant's "capacity to work" was relevant to whether the defendant could
comply with a three-year payment plan under the JVTA.  692 Fed. Appx. 346, 349 (9th Cir. 2017).
Similarly, it has held that a district court may consider future ability to pay when assessing a fine.
*Rearden*, 349 F.3d at 617.  This court should follow every circuit to address this issue and find that
"non-indigent" standard under the JVTA considers not only the defendant's current assets but also her
future earning capacity.  Under this standard, Maddox is non-indigent because she has educational and
vocational skills that will enable her to find work when she is released from prison.

  While the government acknowledges Maddox's current financial situation, she has not met her
burden of proving that she is incapable of paying a fine.  Nor can she meet that burden given her age and
the shortened range of incarceration that will be imposed if the court follows the parameters of the plea

agreement.  "Under the Guidelines, a district court must impose a fine 'in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.'"  *United States v. Hernandez-Arias*, 757 F.3d 874, 884 (9th Cir. 2014) (quoting U.S.S.G. § 5E1.2(a)).  It is not the government's burden to prove that the defendant should pay a fine; rather, "[t]he defendant bears the burden of proving he is unable to pay the fine."  *United States v. Orlando*, 553 F.3d 1235, 1240 (9th Cir. 2009); *see also United States v. Harper*, 787 F.3d 910, 915 (8th Cir. 2015) (defendant bore burden of proving inability to pay fine within Guidelines range).

A fine on the low end of the Sentencing Guidelines range is reasonable and appropriate.  The PSR correctly identifies the applicable range as $50,000 to $250,000 (PSR at 19).  In determining the appropriate amount of the fine, the court must consider:

> (1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant, to promote respect for the law, to provide just punishment and to afford adequate deterrence;
>
> (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of earning capacity and financial resources;
>
> (3) the burden that the fine places on the defendant and dependents relative to alternative punishments;
>
> (4) any restitution or reparation that the defendant has made or is obligated to make;
>
> (5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;
>
> (6) whether the defendant previously has been fined for a similar offense;
>
> (7) the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and
>
> (8) any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d).  "The amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive."  Id.

These factors support a fine of $50,000.  Particularly in cases such as this in which the harm to victims is significant and yet individual restitution awards are likely to be minimal, and where the

defendant has or will have the ability to pay, a substantial fine is appropriate and needed to fully reflect the seriousness of the offense.

First, the defendant has failed to establish that this fine would be an undue burden relative to alternative punishments.  Even if defendant were found to be currently indigent, the defendant will likely be in her mid-forties when she is released and therefore will likely be able to earn future income. "Even if [the defendant] did demonstrate that he was currently indigent, the district court had a basis for believing that he would be able to pay the fine, the district court had a basis for believing that he would be able to pay the fine in the future" based on his marketable skills as a salesman.  *Orlando,* 553 F.3d at 1240; *Hernandez-Arias,* 757 F.3d at 884 (defendant's skill as an auto mechanic and car salesman supported inference of ability to pay fine amount).

Second, the anticipated restitution obligation in this case is low relative to the extraordinary harm suffered by the victims from the receipt and distribution of images of the victims' abuse. As to identified victims, the difficulty of documenting and accounting for the ongoing damages attributable to users of the child pornography, such as defendant, means that frequently such victims either do not submit restitution claims or, when they do submit such claims, they receive only a small fraction of the total damages they suffered.  Given that the defendant contributed to the specific and serious harms suffered by two individual, known minors and yet no restitution claims have been brought as of yet, a fine would be an appropriate penalty. By statute, fines collected from persons convicted of offenses against the United States are deposited in the Crime Victims Fund. 34 U.S.C. § 20101(b).  Thus, a fine would serve the beneficial sentencing interests of punishment yet also advance the interest of victims by making money available to them.

Third, Maddox does not face any unique civil obligations arising from her criminal conduct, other than the standard collateral consequences that convicted criminal defendants typically face. Notably, a victim whose image that defendant received or distributed could pursue a separate federal

civil action against the defendant, and if that were done, there is a presumption that the minimum amount of damages is no less than $150,000.  18 U.S.C. § 2255.

## V.   SENTENCING EXHIBITS AND TESTIMONY

The United States reserves the right to present testimony, exhibits (including additional samples of the defendant's child exploitation images and other material recovered during the investigation), and a supplemental filing in response to any memoranda or exhibits that the defendant files or chooses to introduce prior to or at sentencing.  The undersigned will make available for review by defense counsel prior to the sentencing hearing any additional exhibits which are not already attached here (submitted under seal) and which the United States will seek to offer into evidence.

## VI.   CONCLUSION

In requesting a sentence of 18 years imprisonment and lifetime supervised release, the government has taken into account the seriousness of the defendant's conduct, the impact on the minor victims, the defendant's acceptance of responsibility, the advisory sentencing guidelines range calculated by the probation office, and the 3553(a) factors.  For the reasons stated above, the United States asks the court to follow the recommendations in this memorandum.

McGREGOR W. SCOTT
United States Attorney

By:  /s/ David Gappa
David Gappa
Assistant United States Attorney

/s/ Nadia Prinz
Nadia C. Prinz
Trial Attorney
United States Department of Justice
Criminal Division
Child Exploitation and Obscenity Section